**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

        v.

PATRICIA ANN LARSON,
        *Defendant-Appellant.*

No. 05-30076

D.C. No.
CR-04-00110-SEH

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

        v.

LEON NELS LAVERDURE,
        *Defendant-Appellant.*

No. 05-30077

D.C. No.
CR-04-00110-SEH

OPINION

Appeals from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted En Banc
March 20, 2007—San Francisco, California

Filed August 1, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Harry Pregerson, Stephen Reinhardt, Pamela Ann Rymer,
Michael Daly Hawkins, Susan P. Graber,
Kim McLane Wardlaw, Raymond C. Fisher,
Ronald M. Gould, Richard A. Paez, Richard C. Tallman,
Richard R. Clifton, Carlos T. Bea, Milan D. Smith, Jr., and
Sandra S. Ikuta, Circuit Judges.

9139

Opinion by Judge Paez;
Concurrence by Judge Graber;
Dissent by Judge Hawkins

**COUNSEL**

David F. Ness, Assistant Federal Defender, Federal Defenders of Montana, Great Falls, Montana, and James B. Obie, Helena, Montana, for the defendants-appellants.

Joseph E. Thaggard, Assistant United States Attorney, United States Attorney's Office, Great Falls, Montana, for the plaintiff-appellee.

## OPINION

PAEZ, Circuit Judge:

These appeals present the question whether the Sixth Amendment Confrontation Clause rights of Defendants Patricia Ann Larson and Leon Nels Laverdure were violated when they were barred from cross-examining two witnesses about the mandatory minimum prison sentences that they would have faced but for their cooperation with the Government. A three-judge panel of our court held that there was no constitutional violation and affirmed Defendants' convictions. *United States v. Larson,* 460 F.3d 1200 (9th Cir. 2006). We subsequently granted rehearing en banc. Before addressing the merits of Defendants' constitutional arguments, we clarify the standard of review that we apply to Confrontation Clause challenges. Under the circumstances here, we review for abuse of discretion, and we hold that Defendants' Confrontation Clause rights were violated. The error was harmless, however, and we therefore affirm their convictions.[1]

## I.

### Background

In 2003, the Great Falls Police Department began investigating a number of drug dealers in the Great Falls, Montana area. In April 2003, the Department paid informant Connie Riggs to make a controlled purchase of 1.8 grams of methamphetamine from Larson. The police unsuccessfully attempted

---

[1]Defendants do not challenge their sentences.

a second controlled buy from Larson through Riggs. In October 2003, informant Jason Gilstrap made two controlled purchases of methamphetamine from Laverdure, one in the amount of 1.46 grams and the other in the amount of 1.79 grams. In December 2003, a third informant purchased 3.2 grams of methamphetamine from Joy Lynn Poitra and her cousin, Rick Lee Lamere. Two weeks later, the same informant purchased another twenty-one grams of methamphetamine from Poitra.

On July 23, 2004, a federal grand jury indicted Larson, Laverdure, Poitra, and Lamere in a single indictment, charging each with one count of conspiracy to possess methamphetamine with intent to distribute.[2] The Government informed Lamere that because he had at least two prior felony drug convictions, he faced a statutory mandatory minimum sentence of life imprisonment without the possibility of release. *See* 21 U.S.C. § 841(b)(1)(A).

Both Poitra and Lamere entered into plea agreements whereby they agreed to cooperate and to testify against Larson and Laverdure. In return, the Government represented that if Poitra and Lamere testified to its satisfaction, it would file a motion for a reduced sentence, recommending to the court the extent of departure warranted by the cooperation. *See* U.S.S.G. § 5K1.1 (2004). Lamere pleaded guilty to the conspiracy charge and admitted to having distributed five kilograms of a substance containing methamphetamine. Only by

---

[2]The indictment alleged that between January 1, 1999, and February 29, 2004, the four (and others) conspired "to possess with the intent to distribute controlled substances, including but not limited to 500 grams or more of a substance containing a detectable amount of methamphetamine," in violation of 21 U.S.C. §§ 841(a)(1) and 846. The indictment attributed five to fifteen kilograms of a substance containing methamphetamine and two to 3.5 kilograms of cocaine to Larson, five to fifteen kilograms of a substance containing methamphetamine to Laverdure, and five to fifteen kilograms of a substance containing methamphetamine to Lamere. (No specific amount of methamphetamine was attributed to Poitra.)

the Government's motion for substantial assistance could Lamere receive a sentence below the statutory mandatory minimum of life imprisonment. *See* 18 U.S.C. § 3553(3); U.S.S.G. § 5K1.1 cmt. n.1 (2004). Poitra pleaded guilty under a superseding indictment that charged her with conspiring to possess with intent to distribute at least fifty grams of a substance containing a detectable amount of methamphetamine. As a result of her plea, she faced a statutory minimum sentence of five years imprisonment in the absence of a § 5K1.1 motion by the Government, with a potential maximum sentence of forty years in prison. 21 U.S.C. § 841(b)(1)(B).

In October 2004, Larson and Laverdure proceeded to trial before a jury. Poitra and Lamere testified as witnesses for the Government.[3] Poitra testified that in 2003, Laverdure, her third cousin, offered to help her purchase methamphetamine. Poitra agreed and later accompanied Laverdure when he went to purchase the methamphetamine. She waited in an alley while Laverdure walked toward Larson's house. Laverdure returned with .25 ounces of methamphetamine, which Poitra later sold. Poitra continued to purchase methamphetamine regularly from Laverdure, totaling about 3.5 ounces. She testified that she overheard Laverdure calling "Patty" Larson to obtain methamphetamine on one or two occasions. Poitra further testified that she obtained from Lamere both the 3.2 and twenty-one grams of methamphetamine that she sold to the confidential informant, and that Lamere obtained the latter quantity for her from Larson.

Poitra acknowledged before the jury that she had also been charged with conspiring to possess methamphetamine with intent to distribute and that she was cooperating with the expectation that the Government would move to reduce her sentence. She admitted that she was a drug addict and a dealer. On cross-examination, Poitra also admitted that she had engaged the police in a high-speed car chase and that,

---

[3]Neither Poitra nor Lamere had been sentenced at the time.

when caught, she had been found with methamphetamine, marijuana, a digital scale to weigh drugs, and ammunition for a 9mm handgun. She acknowledged that she had distributed 280 grams, roughly ten ounces, of methamphetamine. Larson's counsel questioned Poitra about inconsistencies in her testimony, including her previous statement to police that a person other than Larson or Laverdure had been Lamere's only source of methamphetamine.

Larson's counsel asked Poitra whether she faced a mandatory minimum sentence of five-years imprisonment in the absence of a motion by the Government to reduce her sentence; she answered that she did. The district judge interjected that this line of questioning was improper and informed the jury that "all matters related to sentencing are the decision of the court and the court only." The court, however, permitted counsel to ask Poitra whether she understood that only the Assistant United States Attorney could move to reduce her sentence. Poitra acknowledged that she did, and further testified that she had a two-year-old child and did not want a prison sentence.

Lamere testified that he obtained about ten ounces of methamphetamine from Laverdure. On four occasions, Lamere was told by Laverdure that Larson was his methamphetamine source, identifying her as the source of 1.5 ounces total. Lamere also testified that he purchased six ounces of methamphetamine from a man named Fasto Komeotis. Komeotis told Lamere that the drugs came from Larson. Lamere testified that he would drop Komeotis off about a block away from Larson's house and that Komeotis would return with the drugs.

Lamere testified that he pleaded guilty to conspiring to distribute more than 500 grams of methamphetamine and that he was cooperating with the Government in the hope that he would receive a reduced sentence. He admitted that he was both a drug addict and a drug dealer. He testified that he had

sold at least ten pounds of methamphetamine and that he had been averaging $3,600 a day in drug sales. He also admitted that he had been convicted of seven felonies, including drug-related felonies, and that he had served 2-1/2 years in prison. On cross-examination, Lamere acknowledged that on direct examination he testified that he made about fifty purchases from Laverdure, but that at his change of plea hearing he had testified that he only dealt with Laverdure three or four times.

Other witnesses also testified on behalf of the Government. Informant Riggs testified regarding her controlled purchase of approximately 1/16 ounce of methamphetamine from Larson. Riggs admitted to having had a drug and alcohol problem for twenty-eight years, and to improperly using the money the Government gave her for making the controlled purchase to buy drugs. Riggs acknowledged that drug users often help each other buy drugs and that, when Larson obtained the methamphetamine for her, Larson had originally asked for some of the drug in exchange for her assistance. Riggs testified that she had attempted a second, unsuccessful controlled buy from Larson.

Informant Gilstrap testified that he made two controlled purchases from Laverdure. He testified that he had bought some methamphetamine from Laverdure "a few times" before, in "very little" amounts of approximately 1/4 gram. Gilstrap admitted that he was a drug addict who had been arrested for drug possession and had gone to prison three times for drug-related felonies. Gilstrap acknowledged that, as a benefit of his involvement in the controlled purchases, he was permitted to live with his family while still an inmate.

After the Government rested its case, Larson and Laverdure moved for the district court to reconsider its ruling preventing them from inquiring into the statutory mandatory minimum sentences that Poitra and Lamere faced. The court denied the motion. The jury found Larson and Laverdure guilty. The court later sentenced Larson to 97-months imprisonment, fol-

lowed by four years of supervised release. The court sentenced Laverdure to 188-months imprisonment, followed by four years of supervised release.

On appeal, Larson and Laverdure argue, among other things, that the district court violated their Confrontation Clause rights when it refused to allow counsel to cross-examine Poitra and Lamere about the mandatory minimum sentences that they faced in the absence of cooperation with the Government. A three-judge panel of our court determined that their Confrontation Clause rights were not violated because Poitra's five-year minimum sentence was of slight probative value, examination regarding Lamere's potential life sentence created a significant risk of undue prejudice, and "the jury otherwise received sufficient information from which to evaluate the cooperating witness's biases and motivations." *Larson*, 460 F.3d at 1210. The three-judge panel also rejected Defendants' challenge to the district court's evidentiary ruling allowing Lamere to testify that Laverdure and Komeotis told him that Larson was the source of their methamphetamine, and to the court's denial of their request to sit at the counsel table, rather than behind counsel. *See id.* at 1210-17.

In this en banc proceeding, we focus our inquiry on Defendants' Confrontation Clause challenge. We hold that the district court did not abuse its discretion by limiting Defendants' cross-examination of Poitra, but that Defendants' Confrontation Clause rights were violated when the district court barred Defendants from questioning Lamere about the mandatory life sentence that he faced in the absence of a motion by the Government to reduce his sentence. We conclude, however, that the error was harmless, and we affirm Defendants' convictions.[4]

---

[4]Because we agree with the three-judge panel's disposition of the remaining issues that Defendants raise on appeal, we adopt those portions of the panel opinion with the exception of the final three paragraphs of

## II.

## Standard of Review

[1] We begin by acknowledging an intra-circuit conflict regarding the standard of review for Confrontation Clause challenges to a trial court's limitations on cross-examination.[5] *See United States v. Rodriguez-Rodriguez*, 393 F.3d 849, 856

---

Section III.B. *See Larson,* 460 F.3d at 1210-17. These final paragraphs addressed an issue that was unresolved at the time: whether the test articulated in *Ohio v. Roberts*, 448 U.S. 56 (1980), to determine the admissibility of out-of-court nontestimonial statements survived *Crawford v. Washington*, 541 U.S. 36 (2004). *See* 460 F.3d at 1213. The Supreme Court has since clarified, however, that *Crawford* "eliminat[es] Confrontation clause protection against the admission of unreliable out-of-court nontestimonial statements" and that "the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability." *Whorton v. Bockting*, 127 S. Ct. 1173, 1183 (2007). Adopting the portions of the three-judge panel opinion that concluded that the out-of-court statements by Komeotis and Laverdure were made in furtherance of the conspiracy and were nontestimonial, 460 F.3d at 1212-13, we hold that under *Crawford*, Defendants' Confrontation Clause rights were not violated by the admission of these statements.

[5]There is also disagreement among the circuits mirroring our intra-circuit conflict. *Compare United States v. Vitale*, 459 F.3d 190, 195 (2d Cir. 2006) (reviewing Confrontation Clause claims de novo) *with United States v. Orisnord*, 483 F.3d 1169, 1178 (11th Cir. 2007) (publication pending) (reviewing for abuse of discretion a Confrontation Clause claim based on a limitation on cross-examination); *United States v. Smith*, 451 F.3d 209, 220 (4th Cir. 2006) (reviewing restrictions on cross-examination claims for abuse of discretion); *United States v. Tykarsky*, 446 F.3d 458, 475 (3d Cir. 2006) (same) *and United States v. Kenyon*, 481 F.3d 1054, 1063 (8th Cir. 2007) ("We review evidentiary rulings regarding the scope of a cross examination for abuse of discretion, but where the Confrontation Clause is implicated, we consider the matter de novo.") (citations omitted); *United States v. Townley*, 472 F.3d 1267, 1271 (10th Cir. 2007) ("Although a district court's evidentiary rulings are reviewed for abuse of discretion, whether admission of such evidence violates the Confrontation Clause is reviewed *de novo*."), *petition for cert. filed*, ___ U.S.L.W. ___ (U.S. Mar. 12, 2007) (No. 06-10032).

(9th Cir.) (recognizing the conflict), *cert. denied*, 544 U.S. 1041 (2005). One line of Ninth Circuit cases has applied de novo review. *See, e.g.*, *United States v. Holler*, 411 F.3d 1061, 1066 (9th Cir.) ("We review de novo whether a limitation on cross examination violated the defendant's right of confrontation."), *cert. denied*, 126 S. Ct. 597 (2005); *United States v. Wilmore*, 381 F.3d 868, 871 (9th Cir. 2004) ("Whether a limitation on cross-examination is so restrictive that it constitutes a violation of a defendant's Sixth Amendment right is reviewed *de novo*."); *United States v. Adamson*, 291 F.3d 606, 612 (9th Cir. 2002) ("We review de novo whether limitations on cross-examination are so severe as to violate the Confrontation Clause."); *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) ("Whether limitations on cross-examination are so severe as to violate the Confrontation Clause is a question of law reviewed de novo.").

A second line of cases has applied an abuse of discretion standard. *See, e.g.*, *United States v. Lo*, 231 F.3d 471, 482 (9th Cir. 2000) ("[W]e review a trial court's decision to limit the scope of cross-examination for abuse of discretion, and will find a Confrontation Clause violation only if the trial court's ruling limits relevant testimony[,] . . . prejudices the defendant . . . and denies the jury sufficient information to appraise the biases and motivations of the witness.") (internal quotation marks omitted) (alterations in original); *United States v. Shabani*, 48 F.3d 401, 403 (9th Cir. 1995) (reviewing limits on cross-examination for abuse of discretion); *Wood v. Alaska*, 957 F.2d 1544, 1550 (9th Cir. 1992) ("Because trial judges have broad discretion both to determine relevance and to determine whether prejudicial effect or other concerns outweigh the probative value of the evidence, we will find a Sixth Amendment violation only if we conclude that the trial court abused its discretion.").

A third line of cases combines these two approaches. *See, e.g.*, *United States v. Shryock*, 342 F.3d 948, 979-80 (9th Cir. 2003) ("Whether limitations on cross-examination are so

severe as to violate the Confrontation Clause is a question of law we review de novo . . . . We review for an abuse of discretion the district court's limitation of cross-examination."); *United States v. Bensimon*, 172 F.3d 1121, 1128 (9th Cir. 1999) ("This court reviews *de novo* whether the limitation on cross-examination violated [the defendant's] right of confrontation. The district court, however, has considerable discretion in restricting cross-examination, and this court will find error only when that discretion has been abused.") (citations omitted); *United States v. James*, 139 F.3d 709, 713 (9th Cir. 1998) ("The district court may impose reasonable limits on cross-examination, which we will review for an abuse of discretion. Whether limitations on cross-examination are so severe as to amount to a violation of the confrontation clause is a question of law we review *de novo*.") (citation and internal quotation marks omitted); *United States v. Vargas*, 933 F.2d 701, 704 (9th Cir. 1991) ("The trial judge has discretion to impose reasonable limits on cross-examination, and this court finds error only when that discretion has been abused. . . . Whether limitations on cross-examination are so severe as to amount to a violation of the confrontation clause is a question of law reviewed de novo.").

**[2]** We resolve this conflict by concluding that the third approach is most appropriate. We hold that the following approach should be used to review whether a trial court improperly restricted a defendant from cross-examining a prosecution witness: If the defendant raises a Confrontation Clause challenge based on the exclusion of an area of inquiry, we review de novo. In reviewing a limitation on the scope of questioning within a given area, we recognize that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). A challenge to a trial court's restrictions on the man-

ner or scope of cross-examination on nonconstitutional grounds is thus reviewed for abuse of discretion.

This approach is in harmony with the Supreme Court's decision in *Van Arsdall*.[6] In *Van Arsdall*, the Court recognized that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits" on cross-examination. *Id.* The Court held, however, that where "the trial court prohibited *all* inquiry into the possibility" of a witness' bias, the defendant's Confrontational Clause rights were violated. *Id.* This standard also recognizes that whether there has been a Confrontation Clause violation is ultimately a question of law that must be reviewed de novo. *See Shryock*, 342 F.3d at 979; *cf. Ornelas v. United States*, 517 U.S. 690,

---

[6]It also brings us in line with a number of our sister circuits. *See, e.g., United States v. Holt*, ___ F.3d ___, 2007 WL 1412543, *3 (7th Cir. 2007) (publication pending) ("We review the district court's decision to limit the scope of cross-examination for an abuse of discretion. If the Sixth Amendment right to confrontation is directly implicated, however, our review is *de novo*.") (citations omitted); *United States v. Kenyon*, 481 F.3d 1054,1063 (8th Cir. 2007) ("We review evidentiary rulings regarding the scope of a cross examination for abuse of discretion, but where the Confrontation Clause is implicated, we consider the matter *de novo*.") (citations omitted); *United States v. Martinez-Vives*, 475 F.3d 48, 53 (1st Cir. 2007) ("On a challenge to a district court's limitation of cross-examination, we first perform a *de novo* review to determine whether a defendant was afforded a reasonable opportunity to impeach adverse witnesses consistent with the Confrontation Clause. Provided that threshold is reached, we then review the particular limitations only for abuse of discretion.") (citations and internal quotation marks omitted); *United States v. Hitt*, 473 F.3d 146, 155-56 (5th Cir. 2006) ("A district court's limitation of cross-examination of a witness is reviewed for abuse of discretion. Abuse-of-discretion review is only invoked if the limitation did not curtail the defendant's Sixth Amendment right to confront witnesses. Whether a defendant's Sixth Amendment rights were violated is reviewed de novo.") (citations omitted), *cert. denied*, 127 S. Ct. 2083 (2007); *United States v. Townley*, 472 F.3d 1267, 1271 (10th Cir. 2007) ("Although a district court's evidentiary rulings are reviewed for abuse of discretion, whether admission of such evidence violates the Confrontation Clause is reviewed de novo.").

697-99 (1996) (holding that courts of appeal are to review de novo district court determinations regarding reasonable suspicion and probable cause, reasoning that de novo review prevents divergent interpretations of similar facts, enables appellate courts to maintain control of legal rules, and unifies precedent). At the same time, this standard allows the trial court discretion to manage the presentation of evidence and restrict examination based on relevant considerations. *See Van Arsdall*, 475 U.S. at 679.

**[3]** Applying this approach here, Defendants' Confrontation Clause claims challenge the district court's limitation on the scope of cross-examination within an area of inquiry: the biases and motivations to lie of the Government's cooperating witnesses, Poitra and Lamere. We therefore review Defendants' claims for abuse of discretion.

## III.

### Discussion

### A. Constitutional Error

**[4]** The Confrontation Clause of the Sixth Amendment, which "guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him,' " *Van Arsdall*, 475 U.S. at 678, includes "the right of effective cross-examination," *Davis v. Alaska*, 415 U.S. 308, 318 (1974). Effective cross-examination is critical to a fair trial because "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis*, 415 U.S. at 316. We, like the Supreme Court, have "emphasized the policy favoring expansive witness cross-examination in criminal trials." *Lo*, 231 F.3d at 482; *see also Van Arsdall*, 475 U.S. at 678-79; *Davis*, 415 U.S. at 316.

**[5]** The Supreme Court has recognized that "the exposure of a witness' motivation in testifying is a proper and impor-

tant function of the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316-17. Thus, "jurors [are] entitled to have the benefit of the defense theory before them so that they [can] make an informed judgment as to the weight to place on [the Government witness'] testimony." *Id.* at 317. As we explained in *United States v. Schoneberg*:

> The constitutional right to cross-examine is "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation," but that limitation cannot preclude a defendant from asking, not only "*whether* [the witness] was biased" but also "to make a record from which to argue *why* [the witness] might have been biased."

396 F.3d 1036, 1042 (9th Cir. 2005) (quoting *Davis*, 415 U.S. at 318) (footnotes omitted) (alterations in original).

**[6]** The issue here is whether the district court erred when it prevented defense counsel from exploring the mandatory minimum sentences that Poitra and Lamere faced in the absence of a U.S.S.G. § 5K1.1 motion by the Government. We have identified three factors courts should consider in determining whether a defendant's Confrontation Clause right to cross-examination was violated:

> (1) [whether] the excluded evidence was relevant; (2) [whether] there were other legitimate interests outweighing the defendant's interest in presenting the evidence; and (3) [whether] the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness.

*United States v. Beardslee*, 197 F.3d 378, 383 (9th Cir. 1999) (citing *United States v. James*, 139 F.3d 709, 713 (9th Cir. 1998)); *see also Holler*, 411 F.3d at 1065 ("A limitation on cross examination does not violate the Confrontation Clause

unless it limits relevant testimony and prejudices the defendant, and denies the jury sufficient information to appraise the biases and motivations of the witness.") (internal quotation marks omitted).

We review the limitation on the cross-examination of each witness separately. *Cf. Van Arsdall*, 475 U.S. at 680 (stating that the inquiry into the prejudice necessary to establish a Confrontation Clause violation "must be on the particular witness"). At trial, Larson's counsel attempted to cross-examine Poitra about the minimum sentence she faced in the absence of cooperation with the Government. However, he was interrupted by the district judge:

> Q.  In fact, you're going to prison for a minimum of five years, right?
>
> A.  Yes.
>
> THE COURT:  Well, just a minute, counsel. You know that the sentencing of defendants in this court is the responsibility of the court. And I will make the decision about the appropriate sentence at the appropriate time. That's not a proper subject of cross-examination.
>
> [DEFENSE COUNSEL]:  Can I ask her about the penalty she's facing?
>
> THE COURT:  I don't give advisory opinions.
>
> [DEFENSE COUNSEL to Poitra]:  What's your understanding of the penalties that you're facing?
>
> [GOVERNMENT]:  Judge, I'm going to object to this.

THE COURT: Sustained.

> And ladies and gentleman, that is because in this court, all matters related to sentencing are the decision of the court and the court only. And that's the way the law is set up and that's the way it works in this court.

[7] We conclude that while the district court restricted defense counsel's cross-examination of Poitra, defense counsel was able to adequately explore Poitra's motivation to lie such that the court's restriction was not an abuse of discretion and did not violate Defendants' Confrontation Clause rights. Poitra testified that she had pleaded guilty and agreed to cooperate with the Government in exchange for a motion to reduce her sentence. She acknowledged that only the Government had the authority to make such a motion, and that she had a young child and did not want to go to prison. Poitra was asked about the mandatory minimum sentence she faced; she acknowledged that she faced at least five years in prison. Although the district court firmly ruled that no further examination would be permitted regarding the actual sentences the cooperating witnesses faced, it did not strike Poitra's response.[7] Because the jury was sufficiently apprised of Poitra's incentive to testify to the Government's satisfaction — including the mandatory minimum sentence that Poitra faced in the absence of cooperation with the Government — there was no Sixth Amendment error.

---

[7]The dissent treats the district judge's remarks as tantamount to striking Poitra's answer. The judge, however, never admonished the jury to disregard Poitra's testimony, nor did any of his comments negate Poitra's testimony that she faced a five-year minimum sentence in the absence of cooperation. The court, in its final instructions, instructed the jury to consider all the evidence. The jury was therefore free to take into account that Poitra faced a five-year minimum sentence in the absence of cooperation and to give such testimony as much weight as it deemed appropriate. On this record, we can only assume that the jury followed the court's instructions.

With respect to Lamere, the district court's prior ruling made it abundantly clear that it would not permit defense counsel to cross-examine Lamere regarding the mandatory minimum life sentence that he faced in the absence of cooperation. Defense counsel heeded the court's admonition and did not affirmatively explore the issue with Lamere.[8]

[8] The fact that Lamere faced a mandatory minimum sentence of life imprisonment in the absence of cooperation with the Government was clearly relevant to assessing his testi-

---

[8]Defense counsel for Larson examined Lamere regarding his incentive to cooperate with the Government as follows:

Q.   And you pled guilty to conspiracy in this case; correct?

A.   Yes, I have.

Q.   And you are facing a prison sentence as a result of this conviction as well; right?

A.   Yes.

Q.   And by testifying here today, you hope to reduce any prison sentence that you may be facing; correct?

A.   Yes.

Q.   And in fact, you signed a plea agreement. And the plea agreement calls for the government's assistance in the event that it deems your cooperation substantial; right?

A.   Yep.

Q.   And you know as well as I do that there's only one person in this courtroom that can even make a motion to reduce your sentence; correct?

A.   Yes, I do.

Q.   And that's [the prosecutor] Mr. Thaggard; right?

A.   Yep.

We note that, although defense counsel did not attempt to question Lamere further on the issue of his mandatory life sentence, Defendants did not forfeit their Confrontation Clause claims in light of the district court's clear ruling. Moreover, Defendants moved for the court to reconsider its ruling at the close of the Government's case, arguing that their Confrontation Clause rights were violated by the limitation.

mony, as it would reveal to the jury Lamere's potential biases and motivations for testifying against Defendants.

**[9]** In evaluating whether other legitimate interests outweighed Defendants' interest in presenting the evidence, "we begin by considering the probative value of the evidence." *James*, 139 F.3d at 713. The probative value of a mandatory life sentence is significant. A cooperating witness who faces a statutorily mandated sentence of life in prison unless the government moves for reduction of the sentence has a compelling incentive to testify to the government's satisfaction. Thus, the mandatory nature of the potential sentence, the length of the sentence, and the witness' obvious motivation to avoid such a sentence cast considerable doubt on the believability of the witness' testimony.

The district judge's stated reason for denying cross-examination of this area of inquiry was that "all matters related to sentencing are the decision of the court and the court only." In the context of this case, that statement was inaccurate. There was no dispute that, in the absence of a motion by the Government, the court would be *required* to sentence Poitra and Lamere to the statutory minimum sentences for the offenses to which they pled guilty. The Government had the discretion to control the potential sentences that Poitra and Lamere could receive, and the district court's rationale cannot form the basis for the exclusion of relevant evidence.

**[10]** We recognize, however, the risk that a jury could infer the potential sentence faced by a defendant from the admission of testimony regarding a witness' mandatory minimum sentence, and that such information could have some influence on the jury's deliberative process. *See United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1991) ("It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict."). Here, there was added risk because Lamere and Poitra were part of the

same conspiracy to distribute methamphetamine as Defendants. *Cf. United States v. Alvarez*, 987 F.2d 77, 82 (1st Cir. 1993) (recognizing the concern that "such testimony might mislead or confuse the jury; particularly where, as here, the witness sought to testify to the same penalties faced by the defendants"). However, while the Government has an interest in preventing a jury from inferring a defendant's potential sentence, any such interest is outweighed by a defendant's right to explore the bias of a cooperating witness who is facing a mandatory life sentence.[9] *See United States v. Chandler*, 326 F.3d 210, 223 (3d Cir. 2003) ("[W]hile the government had a valid interest in keeping from the jury information from which it might infer [the defendant's] prospective sentence were she to be convicted, that interest . . . had to yield to [the defendant's] constitutional right to probe the possible biases, prejudices, or ulterior motives of the witnesses against her.") (internal quotation marks omitted).

Finally, we consider whether the jury was provided with sufficient information otherwise to assess Lamere's credibility. The jury learned that Lamere was both a drug addict and dealer, and that he had sold at least ten pounds of methamphetamine. Lamere admitted that he had been convicted of seven felonies and that he had served 2-1/2 years in prison. Lamere testified that he had pleaded guilty and was cooperating with the Government as a witness against Defendants in the hope that his sentence would be reduced. He acknowledged that the prosecutor was the only person in the courtroom who could move to reduce his sentence.

**[11]** We conclude that, although the above evidence did cast doubt on Lamere's credibility, it did not reveal the magnitude of his incentive to testify to the Government's satisfac-

---

[9]To avoid potential confusion, the district court has discretion to provide the jury with an appropriate limiting instruction or to modify Ninth Circuit Model Criminal Jury Instruction 7.4, regarding jury consideration of punishment, as warranted.

tion. The permitted cross-examination was therefore insufficient to allow the jury to assess Lamere's credibility. As we explained in *Schoneberg*:

> Where a plea agreement allows for some benefit or detriment to flow to a witness as a result of his testimony, the defendant must be permitted to cross examine the witness sufficiently to make clear to the jury what benefit or detriment will flow, and what will trigger the benefit or detriment, to show why the witness might testify falsely in order to gain the benefit or avoid the detriment.

396 F.3d at 1042. Although the jury here learned that Lamere stood to benefit by testifying to the Government's satisfaction, which went a long way "toward satisfying the constitutional requirement," *id.* at 1043, the jury did not learn the extent to which he stood to benefit from testifying in a manner that satisfied the Government.[10] Obviously, an individual facing life in prison without the possibility of release has an extremely strong incentive to testify to the Government's satisfaction.[11] Thus, the jury was deprived of evidence that would have allowed it to determine just how strong Lamere's motivation was to please the Government. As in *Van Arsdall*, "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had . . . counsel been

---

[10]We agree with the dissent that the jury's exposure to information regarding Poitra's mandatory minimum sentence "may have actually compounded the court's error in not allowing any cross-examination of Lamere on this subject."

[11]The concurrence argues that a reasonable jury would have inferred that Lamere faced "substantial prison time." There is, however, a fundamental difference between a sentence involving "substantial prison time" with a likelihood of release and life in prison without the possibility of release, which ensures that no matter how long a person lives, he will live out the remainder of his days behind bars. The fact that Lamere faced a mandatory life term therefore cannot be dismissed as being "of slight marginal utility" even in light of the other information given to the jury.

permitted to pursue his proposed line of cross-examination." 475 U.S. at 680.

[12] We have previously held that it is not error for the district court to prohibit cross-examination regarding the potential maximum statutory sentence that the witness faces. *See United States v. Dadanian*, 818 F.2d 1443, 1449 (9th Cir. 1987), *rev'd on reh'g on other grounds*, 856 F.2d 1391 (9th Cir. 1988); *cf. United States v. Mussare*, 405 F.3d 161 (3d Cir. 2005) (holding that the district court did not abuse its discretion in excluding testimony regarding the maximum penalties the government's witness would have faced in the absence of government cooperation). In *Dadanian*, we referred to such evidence as "at best marginally relevant" to a witness' "potential bias and motive in testifying." 818 F.2d at 1449.

[13] The potential maximum statutory sentence that a cooperating witness *might* receive, however, is fundamentally different from the *mandatory* minimum sentence that the witness *will* receive in the absence of a motion by the Government. The former lacks significant probative force because a defendant seldom receives the maximum penalty permissible under the statute of conviction.[12] In contrast, the fact that here a

---

[12]Other cases from outside our circuit are distinguishable on similar grounds. Most involve the exclusion of testimony regarding the *potential* sentence that the witness faced in the absence of cooperation with the government. *See, e.g.*, *United States v. Arocho*, 305 F.3d 627, 636 (7th Cir. 2002), *superseded by statute on other grounds as recognized in United States v. Rodriguez-Cardenas*, 362 F.3d 958, 959-60 (7th Cir. 2004) (affirming exclusion of cross-examination of government witnesses regarding specific sentences and sentencing guideline ranges they faced before and after cooperation with the government, where the jury had learned that in exchange for their testimony, the government had dismissed several charges against them); *United States v. Cropp*, 127 F.3d 354, 359 (4th Cir. 1997) (affirming exclusion of cross-examination regarding the potential sentences faced by cooperating witnesses); *United States v. Mulinelli-Navas*, 111 F.3d 983, 988 (1st Cir. 1997) (same); *United States v. Alvarez*, 987 F.2d 77, 82 (1st Cir. 1993) (affirming exclusion of cross-examination regarding potential sentence faced by witness where he "had not actually pleaded guilty and . . . might or might not be found guilty at a later trial").

cooperating witness faced a mandatory life sentence without the possibility of release in the absence of a government motion is highly relevant to the witness' credibility. It is a sentence that the witness knows *with certainty* that he will receive unless he satisfies the government with substantial and meaningful cooperation so that it will move to reduce his sentence.[13]

**[14]** These circumstances are similar to those in *Chandler*, an instructive case from the Third Circuit. In *Chandler*, one government witness faced a minimum 97-month sentence under the Sentencing Guidelines, but received only one month of house arrest in exchange for his guilty plea and testimony. 326 F.3d at 222. The jury heard only that the first witness pleaded guilty to an offense with a twelve- to eighteen-month Guidelines sentence range, that he could have been charged with a greater offense, and that he received one month of house arrest and probation. *See id.* The other witness faced a Guidelines minimum sentence of twelve years, and testified that she expected the government to move for a reduced sentence in exchange for her cooperation. *See id*. The district court sustained the government's objections regarding the penalties that the witnesses faced in the absence of cooperation. *Chandler* held that the district court violated the defendant's Confrontation Clause rights because:

> The jury would have had little reason to infer from that information that [the first witness'] cooperation with the government might have meant the difference between more than eight years in prison, on the one hand, and the modest sentence he in fact

---

[13]Furthermore, unlike a potential sentence range under the Sentencing Guidelines, a mandatory minimum sentence is readily ascertainable and is not difficult for a jury to understand. *Cf. Arocho*, 305 F.3d at 636-37 (affirming limitation on cross-examination of potential sentences and sentencing guideline ranges that cooperating witnesses faced, and recognizing that such a "detailed inquiry could place in dispute many side issues, and could also confuse the jury as to the real issue at hand").

received, on the other. The limited nature of [the wit-
ness'] acknowledgment that he had benefitted from
his cooperation makes that acknowledgment insuffi-
cient for a jury to appreciate the strength of his
incentive to provide testimony that was satisfactory
to the prosecution.

*Id.* Thus, as the court reasoned, although the jury was aware
of the witnesses' incentives to lie, they were not aware of the
*magnitude* of those incentives, which would likely have
affected the jury's assessment of their testimony. Applying
that reasoning here, *any* reduction from a mandatory life sen-
tence is of such a significant magnitude that excluding this
information denied the jury important information necessary
to evaluate Lamere's credibility.[14]

[15] Taking the above factors into account, we conclude
that the district court abused its discretion, violating Defen-
dants' Sixth Amendment constitutional right to effective
cross-examination when it prevented defense counsel from
exploring the mandatory life sentence that Lamere faced in
the absence of a motion by the Government.

## B.   Harmless Error Analysis

Having determined that Defendants' Confrontation Clause
rights were violated, we next determine whether the error was
harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at
684 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

---

[14]The fact that Lamere had not yet been sentenced is therefore of no
consequence to this determination. We further note that Lamere would
only be sentenced following the Government's evaluation of the quality
and significance of his testimony at this trial and its subsequent recom-
mendation to the sentencing court regarding a sentence reduction. Thus,
the more incriminating Lamere's testimony against Larson and Laverdure,
the more he would stand to gain from the Government's motion on his
behalf.

Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.*; *see also Schoneberg*, 396 F.3d at 1044 (citing and applying *Van Arsdall* factors).

**[16]** With respect to Laverdure, we conclude that the Confrontation Clause error was harmless beyond a reasonable doubt. Even without Lamere's testimony, the Government offered significant evidence of Laverdure's involvement in a conspiracy to possess methamphetamine with intent to distribute. Poitra's testimony alone was sufficient to establish his involvement in the conspiracy. She testified that in 2003, Laverdure — who knew that Poitra was both a methamphetamine user and seller — offered to obtain methamphetamine for her. She testified that he sold her methamphetamine on a number of occasions, totaling about 3.5 ounces. In addition, Gilstrap and Sergeant Kohm testified that Laverdure had sold methamphetamine to Gilstrap on two occasions.

Furthermore, while it was constitutional error to prevent defense counsel from cross-examining Lamere about the mandatory minimum life sentence that he faced in the absence of Government cooperation, on cross-examination, defense counsel did explore Lamere's criminal past, history as a drug user and seller, and desire to obtain a lesser sentence through his testimony against his co-conspirators. We note, too, that the court instructed the jury that it should view the testimony of the cooperating witnesses with greater caution than that of other witnesses.

**[17]** We also conclude that the Confrontation Clause error was harmless with respect to Larson. The Government's case against Larson was strong even without Lamere's testimony. Poitra testified that Larson was the source of the methamphetamine that Laverdure obtained for her. Poitra overheard Laverdure calling "Patty" Larson to obtain the drugs, and Poitra accompanied Laverdure to an alley by Larson's house while he went to Larson's home and returned with methamphetamine. In addition, Poitra testified that the twenty-one grams of methamphetamine that she sold to the confidential informant were indirectly obtained from Larson. Furthermore, Riggs and Detective Gerhart testified as to Riggs' controlled purchase from Larson. As discussed above, the cross-examination of Lamere, and the court's instruction, also gave the jury reason to doubt Lamere's credibility.

**[18]** We therefore conclude that the constitutional error was harmless beyond a reasonable doubt. Accordingly, we **AFFIRM** the convictions of Larson (No. 05-30076) and Laverdure (No. 05-30077).

---

GRABER, Circuit Judge, with whom RYMER, TALLMAN, CLIFTON, BEA, M. SMITH, and IKUTA, Circuit Judges, join, concurring in part and specially concurring in part:

I agree with the majority opinion except in one major respect: Defendants Patricia Ann Larson and Leon Nels Laverdure suffered no Confrontation Clause violation when the court disallowed a defense question to cooperating co-conspirator Rick Lee Lamere concerning the statutory minimum prison sentence that he would face in the absence of the prosecutor's help in exchange for his testimony. Accordingly, the district court did not abuse its discretion. I would affirm on that ground.

The Supreme Court consistently has held that a Confrontation Clause violation occurs when a trial judge prohibits *any*

inquiry into why a witness may be biased, *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Davis v. Alaska*, 415 U.S. 308, 318 (1974), because "exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination," *Davis*, 415 U.S. at 316-17. The defense must be able to expose through cross-examination a witness' motive to lie, because "[a] reasonable jury might . . . receive[ ] a significantly different impression of [the witness'] credibility" than it would if it had no basis for understanding why a witness may be biased. *Van Arsdall*, 475 U.S. at 680. At the same time, the Supreme Court has taken care to caution that, although a defendant must be permitted to explore a witness' biases, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, . . . prejudice, confusion of the issues, . . . or interrogation that is . . . only marginally relevant." *Id.* at 679; *see also Davis*, 415 U.S. at 316 (noting that the extent of cross-examination of a witness is "[s]ubject always to the broad discretion of [the] trial judge").

Applying those principles, we have found a violation of the Confrontation Clause when a witness had a motive to lie but the trial judge refused to allow cross-examination concerning that motive, leaving the jury to infer that the witness had *no* motive to lie. *United States v. Schoneberg*, 396 F.3d 1036, 1040-43 (9th Cir. 2005) (holding that the limitations placed on the defendant's cross-examination, coupled with the district court's "emphatic admonitions," "vitiated" the defendant's attempt to establish that the witness had a motive to lie); *see also Fowler v. Sacramento County Sheriff's Dep't*, 421 F.3d 1027, 1041 (9th Cir. 2005) (concluding that there was a violation of the Confrontation Clause where *all inquiry* into a witness' bias was foreclosed by the trial judge). Once a defendant has had an opportunity to question a witness about bias, we have permitted "reasonable limits," *Van Arsdall*, 475 U.S. at 679, on the scope of cross-examination. No

Confrontation Clause violation occurs "as long as the jury receives sufficient information to appraise the biases and motivations of the witness." *United States v. Shabani*, 48 F.3d 401, 403 (9th Cir. 1995) (internal quotation marks omitted).

According to the majority, a defendant must be permitted to reveal to the jury not only the fact that the witness has made a deal with the government to testify in the hope of receiving a lesser sentence, but also the precise length of the statutory minimum sentence faced by the witness. "Obviously," according to the majority, a lengthy statutory minimum sentence creates "an extremely strong incentive to testify to the Government's satisfaction"; without such evidence, the jury in this case was unable "to determine just how strong Lamere's motivation was to please the Government." Maj. op. at 9161. Despite its superficial appeal, the majority's argument suffers from two serious flaws.

First, the majority downplays the significant evidence before the jury that suggested Lamere's strong incentive to lie. The jury knew the following facts to assist them in assessing Lamere's credibility:

- Lamere was 31 years old and had five children;

- Lamere was a drug addict and a dealer who had sold at least 10 pounds of methamphetamine;

- Lamere previously had been convicted of seven felonies and had served 2-1/2 years in prison;

- Lamere had pleaded guilty to the drug conspiracy in the present case;

- He faced another prison sentence as a result of that guilty plea;

- By testifying against Defendants, Lamere hoped to reduce his sentence in this case;

- Lamere had entered into a plea agreement with the government. Under his plea agreement, the government would assist Lamere in receiving a shorter prison term in exchange for his testimony against Defendants, but only if the government deemed his cooperation to be "substantial";

- As defense counsel colorfully emphasized in cross-examining Lamere, "you know as well as I do that there's only one person in this courtroom that can even make a motion to reduce your sentence"—the prosecutor; and

- The *other* cooperating witness, Joy Lynn Poitra, who was merely a novice criminal by contrast to Lamere, faced a five-year mandatory minimum sentence.

Knowing those facts, every reasonable juror already would have inferred that Lamere faced substantial prison time and that he was extremely eager to please the prosecutor. The excluded additional fact of the mandatory life term in the absence of a motion from the prosecutor would not have given the jury "a significantly different impression of [Lamere's] credibility." *Van Arsdall*, 475 U.S. at 680. The jury knew Lamere's age, 31, so any lengthy sentence (including the 38-year sentence he ultimately received, even with his substantial assistance to the government) would have been very bad for him. Depriving the jury of the slight marginal utility of knowing about the mandatory life term (in the absence of his cooperation) simply does not equate to a constitutional violation.

Second, the majority's reasoning suffers from a logical flaw. The importance of cross-examination—as the majority recognizes—is to reveal a witness' state of mind and, more particularly, the extent of the witness' incentive to testify to the government's satisfaction. Maj. op. at 9159, 9160. In that

regard, the most important piece of the puzzle is the *antici-pated benefit* that Lamere expected to receive if his assistance satisfied the prosecutor. Yet that information was both unknown and unknowable. The information was unknown because the district court had not yet sentenced Lamere. The information was unknowable because defense counsel did not ask Lamere what benefit he anticipated and, had he been asked the question, "How much of a reduction in your sentence do you expect to get?," the only honest answer could have been, "I don't know."

The statutory minimum sentence that a witness faces is relevant for Confrontation Clause purposes only insofar as it pertains to the sentence that the witness has received or realistically anticipates receiving. So the majority's focus on a statutory term of life in prison *by itself* is a red herring and, worse, that information in isolation could mislead a jury. The majority asserts that a long statutory minimum sentence necessarily means a proportionately significant psychological imperative to assist the prosecutor. Maj. op. at 9160-61. That assertion is incorrect. The important psychological factor—the extent of the witness' motive to lie—is not the statutory minimum, however great or small, but instead is what the witness hoped to gain and, realistically, could expect to gain.

This case provides a good example. Although the statutory minimum sentence was life in prison, as it turned out, Lamere was sentenced to a staggering 38 years in prison. Realistically, given his age, a 38-year prison term was nearly a life sentence anyhow. Is that benefit—the reduction of Lamere's sentence from life to 38 years—as great as the benefit to a witness facing a three-year statutory minimum on whom the court imposes only probation? Not necessarily. Again, the key to understanding a witness' bias is knowing how great a benefit the witness received or reasonably expected to receive.

The majority's reliance on *United States v. Chandler*, 326 F.3d 210 (3d Cir. 2003), therefore, is misplaced. *Chandler* in

fact supports the proposition that the extent of the benefit, not the extent of the theoretical sentence, matters. In *Chandler*, the Third Circuit correctly focused on the enormous benefit that one witness *actually had received* (one month of house arrest versus more than eight years in prison) and the corresponding benefit that the second witness *reasonably could anticipate* based on the magnitude of the benefit that the first witness had received. *Id.* at 222. The court did not find the potential sentences, in isolation, significant, but instead rested its decision on the significant *benefits* that the witnesses either had received or reasonably could expect to receive. *Id.*; *see also United States v. Mussare*, 405 F.3d 161, 170 (3d Cir. 2005) (reiterating that *Chandler* "requires an examination of whether the *magnitude of reduction* [in the witness' sentence] would likely have changed the jury's mind regarding [the witness'] motive for testifying" (emphasis added)), *cert. denied*, 546 U.S. 1225 (2006). As noted, the record here does not answer that key question. Neither Poitra nor Lamere was asked about the magnitude of an expected benefit, and neither could have known what it was likely to be. And we now know, in hindsight, that the benefit that Lamere ultimately received was not substantial; his 38-year sentence effectively was almost a life sentence, given his age at the time of sentencing. *Cf. United States v. Klauer*, 856 F.2d 1147, 1149-50 (8th Cir. 1988) (holding that no Confrontation Clause violation occurred by the exclusion of testimony about the "reduc-[tion of] an otherwise five to seven year sentence to three years" for a testifying co-conspirator).

Once a testifying co-conspirator's biases and motivations have been exposed, the particular number of years faced (in the absence of concrete information about the actual benefit that a witness received or realistically can expect to receive) is only marginally relevant and is outweighed by concerns of jury confusion and jury prejudice. The circuit courts, including ours, agree on that proposition in a number of contexts, including the context of statutory maxima. *See, e.g.*, *United States v. Dadanian*, 818 F.2d 1443, 1449 (9th Cir. 1987)

(holding that knowledge of the specific maximum term of imprisonment faced by a witness "is at best marginally relevant" in assessing the witness' "potential bias and motive in testifying"), *modified on reh'g on other grounds*, 856 F.2d 1391 (9th Cir. 1988); *United States v. Arocho*, 305 F.3d 627, 636-37 (7th Cir. 2002) (holding that testimony about the specific sentences the testifying co-conspirators faced was, "at best, . . . marginally relevant" and outweighed by the potential for jury prejudice), *superseded by statute on other grounds as recognized in United States v. Rodriguez-Cardenas*, 362 F.3d 958, 960 (7th Cir. 2004); *United States v. Cropp*, 127 F.3d 354, 359 (4th Cir. 1997) (holding that "whatever slight additional margin of probative information gained by quantitative questions" about the co-conspirators' potential sentences of 10 and 20 years was outweighed by "the certain [jury] prejudice that would result" if the testimony had been allowed); *United States v. Luciano-Mosquera*, 63 F.3d 1142, 1153 (1st Cir. 1995) ("Any probative value of information about the precise number of years [the testifying co-conspirator] would have faced . . . was slight . . . [and] was outweighed by the potential for [jury] prejudice . . . ."); *see also United States v. Durham*, 139 F.3d 1325, 1334 (10th Cir. 1998) (holding that additional testimony tending "to show how much prison time [the testifying co-conspirator] was avoiding through his plea agreement" was properly excluded by the district court in the light of the extensive cross-examination that was permitted).

I see no reason to stray from this universal rule even in the context of a statutory minimum. The key question is how much benefit the witness hopes to gain *with* cooperation, not how much sentencing discretion the district court retains if the witness does *not* cooperate. Consequently, there is no principled distinction between a statutory maximum and a statutory minimum faced by a cooperating witness. In either situation, a witness could receive a huge benefit or a tiny benefit. In either situation, a district court does not err by ruling that the probative value of the extra information is substantially outweighed by the potential for jury confusion and prejudice.

In summary, I would hold that the jury received enough information to appraise meaningfully Lamere's biases and motives to lie, including his plea agreement and the hoped-for leniency in sentencing if he succeeded in pleasing the prosecutor. The exclusion of the statutory minimum sentence is not a Confrontation Clause violation in the absence of any means, other than pure speculation, to assess how much of a benefit the witness would receive. The district court therefore did not abuse its discretion when it excluded that portion of Lamere's testimony.

It also bears noting that the majority's rule is overbroad and impractical. The rationale that animates its opinion could apply to any statutory minimum term of years, not just to a statutory term of life in prison. The strength of a witness' incentive to assist the prosecutor may be just as great or greater if she is a young mother facing a 5-year statutory minimum term, or if he is terminally ill and subject to a 10-year statutory minimum. Are 5-year and 10-year minima long enough to require disclosure in cross-examination? The majority's opinion does not tell us the answer.

One practical consequence of that kind of ambiguity is that prudent trial judges will feel constrained to allow testimony about cooperating witnesses' expected statutory minimum sentences. I question the wisdom of removing significant discretion from trial judges in the face of the Supreme Court's reminders that they are to retain "broad discretion," *Davis*, 415 U.S. at 316, and "wide latitude," *Van Arsdall*, 475 U.S. at 679, in controlling cross-examination. I also question the desirability of that outcome in view of the potential, which the majority acknowledges, of such testimony to create jury confusion and jury prejudice.

Additionally, the majority's rule may have unintended, far-reaching consequences. What will happen if the court or the government miscalculates, or a witness misunderstands, the applicable statutory minimum? If the jury is misinformed,

will the defendant have grounds for reversal or collateral attack if convicted? The majority has, I fear, written a recipe for unnecessary secondary litigation.

Finally, even if there were error, it was harmless beyond a reasonable doubt. Maj. op. at 9165-66. In that respect, as well as in all others except those discussed above, I agree with the majority opinion.

For the foregoing reasons, I concur in part and specially concur in part.

---

HAWKINS, Circuit Judge, with whom PREGERSON, REINHARDT, and WARDLAW, Circuit Judges, join, dissenting:

A conceded street user of drugs is made into a distributor through the testimony of two witnesses, both facing mandatory prison terms. There is nothing particularly new about former colleagues "singing for their supper" — the problem here is that the jury did not know of the full extent of the witnesses' motivation and they were actively misled about what they did know. The majority properly concludes that what happened violated the defendants' Sixth Amendment confrontation rights, but ultimately concludes that this constitutional violation was harmless error. Thus, while I concur in the majority opinion's analysis of the standard of review (Section II) and agree with its conclusion that there was a Confrontation Clause violation with respect to the restrictions on cross-examining Rick Lamere (Section III.A.), I respectfully dissent from the majority's conclusion that the restrictions on the cross-examination of Joy Poitra did not violate the Confrontation Clause.

The majority concludes that the jury was sufficiently apprised of Poitra's motivation to lie because defense counsel asked her if she was going to prison for a minimum of five

years and she responded "yes." A review of the transcript calls into question whether the jury actually even heard or heeded Poitra's affirmative answer, as the government conceded at oral argument, because of the court's immediate intervention.[1] But even if the jury heard Poitra answer "yes," it was to the question of whether she faced a "minimum" of jail time — not mandatory jail time — of five years, which only the government, and not the judge, could cause to be reduced.

In any event, any supposed benefit from this admission was immediately undercut by the court's *sua sponte* interruption:

> THE COURT:     Well, just a minute counsel. You know that the sentencing of defendants in this court is the responsibility of the court. And I will make the decision about the appropriate sentence at the appropriate time. That's not a proper subject of cross-examination.

When defense counsel tried to at least explore Poitra's own understanding of the penalty she was facing — clearly relevant to her motivation to lie, regardless of the sentence the court actually imposed — the government objected and the court sustained the objection. Moreover, the court further (and, in light of the mandatory minimums involved in this case, incorrectly) admonished the jury:

> THE COURT:     And ladies and gentleman, that is because in this court, all matters related to sentencing are the decision of the court and the court

---

[1] The Assistant United States Attorney who also prosecuted Larson and Laverdure at trial argued the appeal. At oral argument before the en banc court, he stated that, "With respect to Ms. Poitra, I didn't have a chance to object before the district court actually did that sua sponte."

only. And that's the way the law is
set up and that's the way it works
in this court.

Because of the court's statements, counsel was not effec-
tively allowed to convey the fact that Poitra was facing a
*mandatory minimum sentence* absent a motion by the govern-
ment. Although the jurors may have been aware of Poitra's
general incentives to lie, they were not fully aware of the
magnitude of those incentives, which could have significantly
affected their assessment of her testimony. Indeed, the little
testimony about sentencing that was allowed — Poitra's testi-
mony about five years — may have actually compounded the
court's error in not allowing any cross-examination of Lamere
on this subject, although Lamere was facing a mandatory
minimum sentence of life without parole. Having heard Poitra
mention five years, and being barred from learning anything
about Lamere's exposure, a rational juror may well have
thought that Lamere only faced five years.

Because of these concerns, I also cannot agree with the
majority's conclusion regarding harmless error (Section
III.B.). In assessing the harmlessness of the Confrontation
Clause error, we must consider the trial as a whole, including
the importance of the improperly-restricted witnesses and the
strength of the other evidence presented by the government.
*See Van Arsdall*, 475 U.S. at 684.

Connie Riggs testified that she had purchased a small
amount of methamphetamine from Larson in a controlled buy,
but that even in that sale Larson did not personally have the
drugs and had to go elsewhere to obtain 1/16th of an ounce
for Riggs. On a second attempted purchase by Riggs, Larson
did not have any drugs and said she could not obtain any for
Riggs. Jason Gilstrap testified that in two controlled buys he
had directly purchased a small amount of methamphetamine
(also about 1/16th of an ounce) from Laverdure.

These small sales, however, do not link Larson or Laverdure to a much larger conspiracy to distribute drugs with Poitra and Lamere, which was the sole charge contained in the indictment. Poitra and Lamere were critical witnesses to establish the charged conspiracy, and the jury was not sufficiently apprised of their incentive to curry favor with the government. Thus, I cannot say that the Confrontation Clause error with respect to these crucial witnesses was harmless beyond a reasonable doubt. *Id.* at 684. I would therefore reverse the convictions of Larson and Laverdure.