Filed 6/21/13  P. v. Smallwood CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070806 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F03901) |
| v. | |
| DETOURIANTAE KYMONO SMALLWOOD, | |
| Defendant and Appellant. | |

In December 2011, a jury found defendant Detouriantae Kymono Smallwood guilty of second degree robbery, unlawfully carrying a loaded firearm in a vehicle, possessing a short-barreled shotgun, and concealing a short-barreled shotgun in a vehicle. The jury also found true the enhancement allegation that defendant personally used a firearm in the commission of the robbery.  The court sentenced defendant to a total of 13 years in prison.

On appeal, defendant claims the judgment must be reversed because the trial court unconstitutionally limited his cross-examination of Sacramento Police Officer Amy Slay. He further claims that the court prejudicially erred by failing sua sponte to instruct the jury on accomplice testimony.  We disagree and affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

In June 2010, the victim was walking around a Sacramento neighborhood selling corn out of a cart. A white car drove past her and then stopped. Two people got out of the car, one from the front passenger seat and one from the rear passenger seat. The person who exited the front passenger seat walked over to the victim, pulled a wooden-handled shotgun out from under his sweatshirt, pointed it at her, and demanded money. This person was later identified as defendant. The second individual walked over and untied a bag the victim was wearing around her waist (sometimes described as a fanny pack). The bag was black and contained the victim's money and cell phone. The two men returned to the car and drove away.

Michael Harris, an eyewitness to the crime, lived across the street from where the robbery occurred and saw the whole event through his living room window. He saw a white Nissan Altima drive by about three times. Harris then watched the car stop at the curb across from his house. A male got out of the passenger's side backseat of the car and stood by the hood. The driver stayed in the car. Another male got out from the front passenger's side of the car, approached the victim, and pointed a shotgun at her. Harris saw the victim give up her belongings. "The individual [who] had the gun . . . casually walked back to the car and got in the car and they drove off." Harris could not see if anyone else was in the backseat of the car because a blanket covered the rear, driver's side window blocking his view. He immediately called 911 to report the robbery.

Upon responding to the scene, Sacramento Police Officer Lilia Vasquez spoke with the victim, and Officer Slay spoke with Harris. According to Officer Vasquez, the victim described the robber as "a black male, approximately 18 to 20 years old, approximately six feet tall, weighing possibly more than 200 pounds, wearing a black hooded sweatshirt with a white T-shirt underneath . . . . [H]e was also wearing glasses." At trial, Harris also described the robber as being a black male, around 20 to 21 years old, 6 feet 2 inches or 6 feet 3 inches, weighing between 210 to 240 pounds, having short hair,

2

and wearing a black hooded sweatshirt and glasses. Harris added that the robber had a design on the back pocket of his jeans.

After speaking with Officer Slay, Harris drove to Home Depot. As he was on his way, he saw the same white Nissan Altima from earlier. Harris again called 911 and reported the car's license plate number and that the car was at a FoodMaxx parking lot. The same two males were in the front seats of the car and the third male was still in the backseat. In addition, Harris saw two females in the back of the car whom he had not seen before because of the blanket in the rear, driver's side window.

Sacramento Police Officers Orlando Morales and Michael Pinola were the first to arrive at the FoodMaxx parking lot; they immediately detained the people in the Nissan Altima. The person sitting in the driver's seat was identified as Timothy Kellogg. Defendant was sitting in the front passenger seat, and Demarrio Fearington was in the rear passenger seat. Two females, Bonnie Owens-Pimentel and Ralisha ("Shaniz") Powell, were also in the backseat. A surveillance video showed that defendant, Kellogg, and Fearington entered the FoodMaxx store and stood next to the Coinstar change machine. The victim's fanny pack was also visible in the surveillance video and was recovered from the top of the Coinstar machine by Officer Pinola later that day.

After detaining the suspects, Officer Vasquez dialed the victim's cell phone. Upon dialing, she heard and then saw a phone ringing on the back passenger floorboard of the Nissan Altima. She hung up and dialed the same number again to confirm that the phone inside the vehicle was the victim's. From where she was standing, she could see that the number on the screen was her number. The victim later confirmed that the phone found inside the car was hers. Also found in the trunk of the car was a 12-gauge, sawed-off shotgun wrapped in a blanket.

The victim and Harris were both asked to participate in a field showup in the FoodMaxx parking lot.[1] The victim was with Officer Vasquez and Harris was with Officer Slay in her car during this process. When an officer escorted defendant in front of the police car where the victim was, according to Officer Vasquez, the victim told her in Spanish that he "looked like the person [who] had the gun that robbed her." The victim was unable to identify Kellogg or Fearington. Harris also identified defendant as the person with the gun and said that he recognized defendant's hair and face and the rainbow design on the back of his jeans. Harris was also able to identify Kellogg as the driver and Fearington as the rear passenger who had gotten out and stood by the side of the car. Harris testified that he was "beyond confident" of the identifications he made that day. He was also able to identify defendant at trial. In addition, both Harris and the victim identified the Nissan Altima as the car used in the robbery and said that the gun found in the car looked like the gun used in the robbery.

Defendant's ex-girlfriend, Owens-Pimentel, testified on behalf of the prosecution in exchange for a grant of immunity.[2] She acknowledged that in June 2010, she owned a white Nissan Altima matching the license plate number of the vehicle used during the robbery. However, during her initial statements to Officer Morales, she said the three males left her at Shaniz's house while defendant borrowed the car to get money. Then

---

[1] During a field showup, the police take a witness or witnesses to a location where they are holding a possible suspect. The witnesses are told that the person they view may or may not be the person they observed commit the crime and that they are under no obligation to identify the person. The police admonish the witnesses to keep an open mind during the process and to explain to the officer why the person is or is not the suspect. At a field showup, the police show the suspects one at a time.

[2] Owens-Pimentel was 18 years old and defendant was 15 years old when the two began dating and carrying on a sexual relationship. Thus, the grant of immunity protected Owens-Pimentel from charges of unlawful sexual intercourse with a person under 18. (See Pen. Code, § 261.5.)

the males picked up her and Shaniz from Shaniz's house and they went to the FoodMaxx parking lot.

At trial, Owens-Pimentel admitted she was in the backseat of the car during the robbery. She testified that prior to the robbery, she did not hear about a plan to rob someone and she thought they were driving to Sacramento for Kellogg, the driver, to finish his tattoo. Only when she saw defendant get out of the car and saw a gun under his sweater did she realize what was going to happen. During her testimony, she described the following: defendant was sitting in the front passenger seat; Fearington was in the rear passenger seat; defendant and Fearington got out of the car when it stopped; and Kellogg, who was sitting in the driver's seat, stayed inside the car during the robbery.

Owens-Pimentel testified that she did not see the victim because a shirt hung across her rear, driver's side window blocking her view. However, when defendant and Fearington got back in the car they had a black fanny pack and cell phone. Fearington asked her if she spoke Spanish because the cell phone was locked in Spanish and he wanted to unlock it. Owens-Pimentel said that after the robbery, the group drove to FoodMaxx to use the Coinstar machine. She and Shaniz waited in the car while the boys went inside with the fanny pack. Shortly after they returned from the Coinstar machine, the police arrived.

At trial, defense counsel cross-examined Officer Slay about her training concerning field showups, the protocols she followed in this case, and her interactions with Harris during this process. Amidst this topic, the following colloquy ensued:

"[DEFENSE COUNSEL]: Did you ever receive any training on how to present people for a lineup in the station, like we see on television?

"[OFFICER SLAY]: No, I haven't.

"[DEFENSE COUNSEL]: [D]id you ever receive any training on how to do a photo lineup . . . ?

"[OFFICER SLAY]: Yes.

5

"THE COURT:  Counsel, what's the relevance of a lineup or a photo lineup?  She didn't do a photo lineup or a lineup.  You're questioning her about a field show-up . . . .  Come on, let's move on.  Move on.

"[DEFENSE COUNSEL]:  Did you ever receive any training about the elements of a lineup?

"[¶] . . . [¶]

"[PROSECUTOR]:  Objection.  Relevance.

"[DEFENSE COUNSEL]:  It's very relevant.  It goes to the validity and the conducting of this lineup.

"THE COURT:  I understand.  And I will -- I'm prepared to sustain the objection because you're asking her about a lineup.  But there was no lineup in this case.  She's talking about an in-field show-up[.]  An in-field show-up is not a lineup.  There's [*sic*] two distinct things.  There was no lineup in this case.  There was an in-field show-up[.]  So if you change your term, then I'll overrule the objection.  Ask her about the in field show-up, not a lineup.  There was no lineup here.

"[DEFENSE COUNSEL]:  Your Honor, may I approach?

"THE COURT:  No, you may not.  Ask her about a show-up; okay?

"[DEFENSE COUNSEL]:  Have you ever been trained about the difference between a show-up and a lineup?

"[OFFICER SLAY]:  Yes.

"[DEFENSE COUNSEL]:  Have you ever received information about the difference between a show-up and a lineup?

"[¶] . . . [¶]

"[OFFICER SLAY]:  I'm not sure where you're going with this.

"[DEFENSE COUNSEL]:  Okay.  [¶]  At a field show-up one person is shown at a time; correct?

"[OFFICER SLAY]:  Correct.

6

"[DEFENSE COUNSEL]: And that's called a sequential lineup; is that correct?

"[OFFICER SLAY]: Correct.

"[DEFENSE COUNSEL]: And in a photo array or regular lineup, people are shown to a witness in groups; is that correct?

"[OFFICER SLAY]: Correct.

"[DEFENSE COUNSEL]: Have you ever been told why people are shown in groups?

"[PROSECUTION]: Objection. Relevance.

"THE COURT: This may have some marginal relevance. I'll allow it. [¶] You can answer the question.

"THE WITNESS: No.

"[DEFENSE COUNSEL]: You have not. Okay. [¶] Have you ever received any information about something called a double blind show-up?

"[OFFICER SLAY]: No.

"[DEFENSE COUNSEL]: Have you ever received information about a double blind lineup?

"[OFFICER SLAY]: No.

"[DEFENSE COUNSEL]: Have you ever received any training so as not to accidentally give any nonverbal clues during a show-up?

"[OFFICER SLAY]: Yes.

"[¶] . . . [¶]

"[DEFENSE COUNSEL]: In your training, do you have any information whether the use of weapons or force in a crime can affect a show-up?

"[OFFICER SLAY]: No.

"[DEFENSE COUNSEL]: Okay. [¶] Have you ever done anything other than a sequential display of people during a field show-up?

"[OFFICER SLAY]: No."

7

Defense counsel then moved away from questioning about protocols and comparisons between field showups and lineups and began asking Officer Slay about the specific procedures she followed with Harris, such as statements she made to him in the car on the way to the field showup; the advisement she read him about the identification process; and where they parked in the FoodMaxx parking lot in relation to the white Nissan Altima.

The following day, defense counsel moved for a mistrial "on the grounds that relevant areas of cross-examination were foreclosed to the defense without proper examination of the relevance." She stated that "[t]he Sixth Amendment itself protects the right to cross-examine witnesses against you thoroughly and to test relevant areas that may affect the outcome of this trial. [¶] . . . [D]uring my cross-examination of Officer Slay where I was . . . attempting to make a brief inquiry into the reliability of the show-up . . . to see if any of the safeguards present in . . . the elements of lineups were present[,] [¶] I was foreclosed from asking anything about any of the safeties that were not present in this show-up. . . . [and] was instructed to only speak about this show-up."

However, defense counsel did not explain how additional questioning on the safeguards of a lineup would have proven that the field showup was unreliable or defective.

The court denied the motion for a mistrial, stating that some of defense counsel's questions "were clearly irrelevant." Defense counsel "proceeded to go into a physical lineup . . . where people are actually shown a number of different suspects, when this wasn't a physical lineup. [¶] [She] proceeded to go into a photographic lineup, when there was no photographic lineup in this case. [¶] . . . [She] seemed like [she was] trying to feel [her] way around it, and then [she] finally figured it out that where [she] needed to go with the officer . . . is whether she followed proper procedures in conducting this particular show-up. Okay. And then [defense counsel] did go into it. And then [she] did question her about her knowledge of certain procedures. And I allowed that."

The jury found defendant guilty on all counts. Defendant timely appealed.

DISCUSSION

I

*Defense Counsel's Cross-Examination Of Officer Slay*

On appeal, defendant first argues that "the judgment of conviction must be reversed because [he] was denied his federal and state constitutional rights to due process of law and confrontation [because] the trial court erroneously limited his cross-examination" of Officer Slay regarding the field showup process used to identify defendant. We disagree.

"If the defendant raises a Confrontation Clause challenge based on the exclusion of an *area of inquiry*, we review de novo. [However, i]n reviewing a limitation on the *scope* of questioning within a given area, we recognize that 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' [Citation.] A challenge to a trial court's restrictions on the manner or scope of cross-examination on nonconstitutional grounds is thus reviewed for abuse of discretion." (*United States v. Larson* (9th Cir. 2007) 495 F.3d 1094, 1101, italics added.)

As applied here, defendant's challenge goes to the limitation on the *scope* of his cross-examination of Officer Slay regarding procedural safeties in place during the field showup. The limitation pertains to scope rather than area of inquiry because defendant was permitted to question Officer Slay in detail about the safety procedures she followed during the field showup, but claims to have been limited in the extent of this line of questioning. Therefore, we review for abuse of discretion.

Defendant argues that because the prosecution's case "turned primarily on inherently unreliably [*sic*] eyewitness identification evidence," it was imperative that

9

defense counsel be allowed to "fully question [Officer Slay] about the identification process." He claims that by limiting the cross-examination of Officer Slay regarding the procedural safeties in place for lineups, as compared to field showups, he was denied "the opportunity to discover the truth."

" '[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674, 683].) Under an abuse of discretion review, " 'unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' " (*People v. Chatman* (2006) 38 Cal.4th 344, 372.)

Here, while it is true that defense counsel told the court that questioning Officer Slay about stationhouse and photo lineups went to the validity and conduct of the field showups, counsel made no offer of proof as to *what* she expected to uncover or *how* such discoveries would impact the validity of the field showup or Officer Slay's credibility. Even now, defendant does not provide us with any explanation of how additional questioning on stationhouse and photo lineups would have called into question the validity of the field showup or the conduct or credibility of Officer Slay; he asserts only that he was denied "the opportunity to discover" such information. Defendant's inability to show any specific prejudice in this situation makes it impossible for him to show that the trial court abused its discretion.

Furthermore, although defendant claims that the cross-examination of Officer Slay was unconstitutionally limited because defense counsel was prevented from "inquir[ing] into the reliability of the show-up" by asking if "the safeguards present in . . . the elements of lineups were present," this assertion is inconsistent with the facts. While it is true that the court directed defense counsel to "Ask [Officer Slay] about the in field

10

show-up, not a lineup" because "[t]here was no lineup here," defendant fails to mention that, following this interaction, defense counsel nevertheless proceeded to question Officer Slay about lineups by comparing the procedures of lineups and field showups. Thus, defense counsel asked Officer Slay about the safeties in place in a field showup as compared to a stationhouse or photo lineup anyway. The court allowed this line of questioning and even overruled an objection by the prosecution when defense counsel asked Officer Slay if she knew why the police show people in groups in stationhouse and photo lineups, stating that, "This may have some marginal relevance. I'll allow it." Because defense counsel's further questioning addressed the subject matter that defendant here purports he was unconstitutionally restricted from addressing, defendant cannot "show the limitation on cross-examination [was] a prejudicial limitation"; (*United States v. Jorgenson* (10th Cir. 1971) 451 F.2d 516, 520) therefore, his claim cannot stand.

Finally, in regard to defendant's due process claim, there is no meaningful analytical distinction between this and the right to confrontation. (See *Strickland v. Washington* (1984) 466 U.S. 668, 684–685, [80 L.Ed.2d 674, 691] ["The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment"].) Thus, the resolution of defendant's confrontation claim resolves his due process claim as well.

II

*Instruction On Accomplice Testimony*

Defendant next argues that "the trial court erred prejudicially in failing *sua sponte* to instruct the jury on accomplice testimony" regarding the statements made by Owens-Pimentel during trial. Specifically, defendant claims the court should have given two different instructions: CALCRIM No. 335, regarding the testimony of a witness who was undisputedly an accomplice; and CALCRIM No. 334, regarding the need for corroborating evidence when it is disputed whether the witness was an accomplice.

11

Defendant claims that the omission of these instructions violated his right to due process of law and a fair trial.

As to defendant's claim that the trial court should have instructed the jury on CALCRIM No. 335 (accomplice testimony regarding a witness who was undisputedly an accomplice), it was not error for the trial court to omit this instruction. All evidence points to the conclusion that, it was at least disputed whether Owens-Pimentel was an accomplice. Defendant himself admits this point when he says that "Owens-Pimentel . . . *could* be found to be an accomplice in this case." (Italics added.) The use of the word "could" clearly acknowledges that it is disputed whether Owens-Pimentel was an accomplice because it implies that she could also not be an accomplice. Furthermore, during closing arguments, it was defense counsel who implied that Owens-Pimentel lied about her presence in the car during the robbery and was "making up a new story" when she testified about the details of the robbery at trial. This conflicting evidence regarding the extent of Owens-Pimentel's involvement in the robbery creates at least a dispute as to whether she was an accomplice. Therefore, CALCRIM No. 335 would have been inappropriate in this case. Accordingly, we are left with only defendant's claim regarding CALCRIM No. 334.

The People claim that the omission of CALCRIM No. 334 was not error because Owens-Pimentel was not an accomplice. In the alternative, the People argue that any error regarding an instruction on accomplice testimony was harmless beyond a reasonable doubt because the testimony of Owens-Pimentel "was sufficiently corroborated by independent evidence of [defendant]'s guilt." We agree.

Our Supreme Court has held that " 'the failure to instruct on accomplice testimony . . . is harmless where there is sufficient corroborating evidence in the record.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 982.) Here, the testimony of multiple, independent parties including the victim and Harris provided sufficient corroborating evidence supporting Owens-Pimentel's testimony. Most significantly, Owens-Pimentel

identified defendant as the person with the gun, which was corroborated by the victim's identification of defendant as the robber with the gun to Officer Vasquez and Harris's identification of defendant -- immediately following the incident and at trial -- as the front passenger who pointed the gun at the victim. Owens-Pimentel testified that defendant had the gun under his sweater when he went to rob the victim. The victim corroborated this evidence when she demonstrated in court that the robber had the gun under his sweatshirt. In addition, Owens-Pimentel testified that defendant came back to the car with a black fanny pack that contained coins and a cell phone. This testimony was consistent with that of the victim, who described that on the day of the robbery, she was wearing a black fanny pack containing money and her cell phone.

There was also corroboration of the more minor details of the robbery. For example, Owens-Pimentel described how one of the other parties in the car asked if she spoke Spanish because the victim's phone was locked in Spanish and he wanted to unlock it. The victim speaks Spanish. Owens-Pimentel testified how, prior to the robbery, Kellogg drove around the neighborhood "[l]ooking for somebody" before pulling the car over, though she could not remember how many times they drove around. Her description was consistent with Harris's testimony that the Nissan Altima circled the block three times before pulling over. Owens-Pimentel and Harris both testified that the rear driver's-side window was covered. Finally, Owens-Pimentel's testimony that the driver, Kellogg, stayed in the car was consistent with Harris's testimony that only the front and back male passengers got out of the car and that the driver stayed in the car.

Based on the extent of the corroborating testimony of the other witnesses, we are satisfied that any error in failing to give CALCRIM No. 334 was harmless beyond a reasonable doubt.

DISPOSITION

The judgment is affirmed.


      ROBIE    , J.


We concur:



    NICHOLSON   , Acting P. J.



     DUARTE   , J.