**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Earnest WILMORE, Defendant–Appellant.**

No. 03–10297.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 14, 2004.

Filed Aug. 25, 2004.

Anne R. Traum, Assistant Federal Public Defender, Las Vegas, NV, for the plaintiff-appellee.

William R. Reed, Assistant United States Attorney, Las Vegas, NV, for the defendant-appellant.

Before: LAY,* HAWKINS, and BYBEE, Circuit Judges.

LAY, Circuit Judge:

Earnest Wilmore was convicted of one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (2000). Wilmore contends that his Sixth Amendment rights were violated when the district court restricted his cross-examination of a government witness. We agree, and reverse and remand for a new trial.

I

On December 15, 2001, an individual named Robin John called 911. She told the 911 operator that her husband, Earnest Wilmore, had robbed an abortion clinic, that he was in the apartment complex she was calling from, that he was wearing a red jacket and black pants, and that he had a gun. In truth, there was no abortion clinic robbery. Ms. John later explained that she called the police because Wilmore had taken her children's Christmas gift, a "Play Station" video game system, and she was afraid he was going to sell it for drugs. She had lied about the abortion clinic robbery in order to get the police to respond quickly to the call.

Police Officers Chris Baughman and James Bonkavich responded to the call.

* The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

When they arrived at the apartment complex they met with Ms. John, who directed them to an apartment where she said Wilmore had gone. After repeated knocking, Edward Robinson, who lived in the apartment, came to the door. With the door open, the officers observed Wilmore standing in the apartment talking on the telephone. Both officers testified that Wilmore was wearing black pants and that a red jacket was lying on a chair next to him. Officer Bonkavich escorted Wilmore outside and patted him down. Baughman asked Robinson if the red jacket was his. When Robinson informed him that the jacket was not his, Baughman seized it, finding in it a gun, ammunition, and a cellular telephone. Soon thereafter, Baughman discovered that the phone number identified as "wife" on the cellular telephone directory belonged to Robin John.

The issue at trial was whether Wilmore possessed the gun that police recovered from the red jacket found near him at the time of his arrest. The government alleged the red jacket was Wilmore's, arguing that: 1) Officers Baughman and Bonkavich saw the jacket next to Wilmore when Robinson opened the apartment door; 2) Edward Robinson saw Wilmore wearing the red jacket when Wilmore entered his apartment; 3) the cellular tele-

phone found in the jacket belonged to Wilmore; and 4) DNA found on the jacket matched that of Wilmore. In addition to this evidence, the government planned to have Ms. John testify, consistent with her prior grand jury testimony, that Wilmore was wearing the jacket and possessed the gun on that day. Some time between her grand jury testimony and trial, however, Ms. John told the prosecutors that she intended to disavow her grand jury testimony. The government informed the district court of Ms. John's intended disavowal and arranged for an attorney to be present at trial to counsel Ms. John regarding her Fifth Amendment rights. The district court did not conduct a pre-trial hearing to determine either how Ms. John would testify or whether she intended to invoke her Fifth Amendment privilege against self-incrimination.

At trial, Ms. John testified generally as to what had happened on December 15, 2001, but denied having seen Wilmore with a gun.[1] The government impeached her with her grand jury testimony,[2] but Ms. John continued to assert that she had not seen Wilmore with a gun, stating only that she had been "upset" on the day she gave her grand jury testimony.[3] When the government then asked Ms. John whether her grand jury testimony was truthful, the dis-

[1] At trial, Ms. John testified as follows:
Q. All right, and let me ask you, did you see him with a gun that day?
A. No, I didn't see him with a gun at all. (Tr. at 62.)

[2] Ms. John's grand jury testimony was, in relevant part:
I sat with the Play Station 2 on the table in [my mother's] room, so as I was talking to my mother, and my sister, and another lady inside the room, Earnest [Wilmore] was banging on the door asking my mother to give him his gun.
My mother opened up the door so when Earnest came into the room he still wanted

the Play Station 2, so we started fighting inside the room, and my mom and my sister was trying to help me fight Earnest off because he was so strong. So my mama told him to take his gun and leave, so when he picked up the gun off the table he had—I had the Play Station 2 on the table, too, so he snatched the Play Station 2 up and ... r[a]n out the door. (Tr. at 69–70.)

[3] Ms. John testified, "I was upset. I had just went to jail for drugs when we had this grand jury so, of course, I said that, but I was upset. I didn't see Earnest with no gun. I didn't see him with a gun at all, period." (Tr. at 71.)

trict court stopped the testimony and sent the jury out of the courtroom so he could talk to Ms. John and the attorneys. He advised Ms. John of her Fifth Amendment right and told her that lying in front of the grand jury is a crime of perjury. He then called a ten minute recess to allow Ms. John to talk with her attorney. When they returned, Ms. John's attorney stated that Ms. John understood her Fifth Amendment rights and was prepared to invoke her privilege.

The government then asked the remainder of its questions to Ms. John outside the presence of the jury to see how Ms. John would respond. After some discussion, it was determined that the government would ask Ms. John no more questions and would withdraw its last question as to whether Ms. John had lied to the grand jury. Turning to the defense counsel, the district court indicated that it would allow cross-examination, but cautioned, "what I don't want to do is to hammer the Fifth Amendment business. In other words, where you ask a question that you know she is going to take the Fifth Amendment on." (Tr. at 86.) The court elaborated that it did not want to have defense counsel ask question after question in which Ms. John invoked the Fifth Amendment, stating "I don't want to go through that kind of a circus." (Tr. at 86.) The district court concluded, "[a]ll right, and again the cross-examination—I mean I'm inclined to allow cross-examination, the scope of which would be limited to what happened up until the point—in other words, the point we reached in her testimony." (Tr. at 88.)

The district court then brought the jury back into the courtroom. As planned, the government summarily concluded ques-

tioning. Defense counsel began cross-examination by asking, "Ms. John, you lied to the 911 operator when you called them, didn't you?" (Tr. at 91.) Ms. John invoked her Fifth Amendment privilege. (Tr. at 92.) In accordance with the district court's instructions, defense counsel thereafter limited his questions to topics other than the grand jury testimony and Ms. John did not invoke the Fifth Amendment again during cross-examination.[4]

## II

 The issue before us is whether the limitations on Wilmore's ability to cross-examine Ms. John about her grand jury testimony violated his rights under the Confrontation Clause of the Sixth Amendment. Whether a limitation on cross-examination is so restrictive that it constitutes a violation of a defendant's Sixth Amendment right is reviewed *de novo*. *United States v. Vargas*, 933 F.2d 701, 704 (9th Cir.1991).

The Supreme Court recently revisited its Confrontation Clause jurisprudence in *Crawford v. Washington*, — U.S. —, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In that case, the Court rejected the test it had previously established in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), for the admissibility of a statement by an unavailable hearsay declarant. The *Crawford* Court held that the government cannot introduce testimonial evidence against a criminal defendant where the declarant is unavailable at trial and there was no opportunity for cross-examination at the time the prior testimony was given. *Crawford*, — U.S. at —, 124 S.Ct. at 1374. Although the Court did not provide a detailed definition

4. Ms. John did, however, invoke the Fifth Amendment twice during redirect examina-

tion by the government.

of "testimonial," it held that it encompassed, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* The Court concluded, "[w]here testimonial statements are at issue, the only indicum of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.*

■ We believe that *Crawford* controls in this case. It is undisputed that Ms. John's grand jury testimony was "testimonial," and that Wilmore did not have the opportunity to cross-examine Ms. John at the grand jury hearing. Furthermore, we find that Ms. John's assertion of her Fifth Amendment privilege, coupled with the district court's restriction on cross-examination, made Ms. John "unavailable" with regard to her grand jury testimony.[5] *See* Fed.R.Evid. 804(a) (" 'Unavailability as a witness' includes situations in which the declarant—(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement ...' "); *see, e.g., Padilla v. Terhune,* 309 F.3d 614, 618 (9th

Cir.2002) (assertion of Fifth Amendment privilege makes a witness legally unavailable).

This left Wilmore with no opportunity to "confront" Ms. John about why she testified the way she did before the grand jury or about whether that testimony was true.[6]

■ Cases decided before *Crawford* involving the restriction of cross-examination and government witnesses' invocation of the Fifth Amendment support the conclusion that Wilmore's Sixth Amendment rights were violated. For instance, it is well-established that while a district court has discretion to limit cross-examination, it may not impose restrictions that "limit[ ] relevant testimony and prejudice[ ] the defendant." *United States v. Shabani,* 48 F.3d 401, 403 (9th Cir.1995). In other words, a district court has discretion to limit cumulative cross-examination into a witness's motivations for testifying or potential bias, but it cannot prohibit a defendant from probing a witness's credibility or motives altogether. *See Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (holding that trial judges retain "wide latitude" when

5. Although Ms. John never invoked her Fifth Amendment privilege as to any question by defense counsel directly regarding her grand jury testimony, we find that Ms. John's indication, through counsel, at the bench conference that she would invoke her Fifth Amendment privilege with regard to these questions, together with the district court's subsequent limitation on cross-examination, was tantamount to an invocation of the privilege in regard to this line of questioning.

6. We recognize that the issue in Crawford was somewhat different than in this case. In Crawford, the issue was the admissibility of a statement made by an unavailable hearsay declarant. In the present case, there was no question regarding the admissibility of the grand jury testimony at the time it was admitted. Indeed, the evidence was not even hearsay when admitted. *See* Fed.R.Evid. 801(d)(1) ("A statement is not hearsay if ...

[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... inconsistent with the declarant's testimony...."). Because it was only after the evidence was admitted that Ms. John became unavailable, this case concerns not so much the admission of evidence as the effect of the subsequent restriction on cross-examination and the invocation of the Fifth Amendment. However, we do not find that this distinction is persuasive. There can be no question that, regardless of when a declarant becomes unavailable, the core principle of Crawford is that the defendant must have the opportunity for cross-examination with regard to "testimonial evidence" such as grand jury testimony. *See Crawford,* —— U.S. at ——, ——, 124 S.Ct. at 1369, 1374. Wilmore clearly did not have that opportunity here.

imposing limits on cross-examination but cannot prohibit all inquiry into the possibility of a government witness's bias); *see also United States v. Bensimon,* 172 F.3d 1121, 1128 (9th Cir.1999); *United States v. Feldman,* 788 F.2d 544, 554 (9th Cir.1986) ("The trial court does not abuse its discretion as long as the jury receives sufficient information to appraise the biases and motivations of the witness.").

Here, due to the district court's restriction, Wilmore was prohibited from probing Ms. John's motivations behind her testimony before the grand jury. This line of questioning was not cumulative. Obviously no other witness could, or did, testify about Ms. John's mental state at the grand jury proceeding. It is, of course, impossible to know what such cross-examination would have revealed, if anything at all. We believe, however, that Wilmore was entitled to probe into whether Ms. John was testifying in return for government leniency for legal troubles of her own, or even whether, as Wilmore suggested at trial, Ms. John lied to the grand jury to obscure the fact that the coat was hers.

We have also established a "general rule" that where a government witness invokes the Fifth Amendment on cross-examination, as Ms. John did here, the district court must strike the witness's direct testimony unless the refusal to answer only concerns collateral matters. *Denham v. Deeds,* 954 F.2d 1501, 1503 (9th Cir.1992) (citing *United States v. Cardillo,* 316 F.2d 606, 611 (2d Cir.1963) ("Where the privilege has been invoked as to purely collateral matters ... the witness's testimony may be used against [the defendant]. On the other hand, if the witness by invoking the privilege precludes inquiry into the details of his direct testimony ... that witness's testimony should be stricken.") (citations omitted)). We believe that cross-examination as to the veracity of, and the motivations behind, Ms. John's grand jury testimony was vital to the question of whether Wilmore possessed the gun, which was a substantive element of the crime charged. No other witness testified that they saw Wilmore with a gun. In fact, Ms. John's grand jury testimony was the only direct evidence that Wilmore possessed the gun.[7] We therefore find that it was not collateral, and that, at the very least, Ms. John's testimony should have been stricken.

Thus, in light of Crawford and our other precedent, we hold that Wilmore's Sixth Amendment rights were violated.[8]

### III

Accordingly, we reverse and remand for a new trial.

---

7. For these same reasons, we hold that this restriction on cross-examination was not harmless error.

8. Because we reverse and remand on Sixth Amendment grounds, we do not need to reach Wilmore's second issue on appeal regarding the composition of the jury.