FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>JOSEPH SHAYOTA,<br>*Defendant-Appellant.* | No. 17-10270<br><br>D.C. No.<br>5:15-cr-00264-LHK-1 |
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>ADRIANA SHAYOTA,<br>*Defendant-Appellant.* | No. 17-10271<br><br>D.C. No.<br>5:15-cr-00264-LHK-2<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted February 14, 2019
San Francisco, California

Filed August 19, 2019

Before:  Mary M. Schroeder, Diarmuid F. O'Scannlain,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge O'Scannlain;
Concurrence by Judge O'Scannlain

## SUMMARY[*]

### Criminal Law

The panel affirmed the district court's judgment in a case in which the panel was asked to decide whether prior civil deposition testimony of a witness, who has subsequently invoked his Fifth Amendment right against self-incrimination, may be introduced against defendants in a criminal trial without violating their Confrontation Clause right to confront the witnesses against them.

At the defendants' trial, the district court admitted the civil deposition testimony of two individuals after they invoked their Fifth Amendment privilege not to testify. The district court concluded that their invocation of their Fifth Amendment privilege rendered them unavailable for purposes of the Confrontation Clause. The defendants argued that the government's inherent discretion to grant a witness immunity and thereby prevent him from invoking the Fifth Amendment privilege renders the witness effectively available to the government for testimony at trial. The panel did not need to resolve that issue because even if the district court erred by

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

concluding that the witnesses were unavailable, the error was harmless because the outcome of the trial would not have changed had the depositions been excluded.

The panel addressed other arguments in a memorandum disposition.

Specially concurring, Judge O'Scannlain wrote separately to call attention to this court's precedent regarding the "unavailability" requirement of the Confrontation Clause. Observing that the right of confrontation is "most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding," *Crawford v. Washington*, 541 U.S. 36, 54 (2004), Judge O'Scannlain suggested that this court revisit its prior decisions to perform the historical analysis that *Crawford* demands.

---

**COUNSEL**

Theodore Sampsell-Jones (argued), Sampsell-Jones Law, Minneapolis, Minnesota; Dennis P. Riordan and Donald M. Horgan, Riordan & Horgan, San Francisco, California; for Defendant-Appellant Joseph Shayota.

John D. Cline (argued), Law Office of John D. Cline, San Francisco, California, for Defendant-Appellant Adriana Shayota.

Jonas Lerman (argued), Assistant United States Attorney; J. Douglas Wilson, Chief, Appellate Division; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellee.

## OPINION

O'SCANNLAIN, Circuit Judge:

We are asked to decide whether prior civil deposition testimony of a witness, who has subsequently invoked his Fifth Amendment right against self-incrimination, may be introduced against defendants in a criminal trial without violating their Confrontation Clause right to confront the witnesses against them.

I

At the time of the events giving rise to this case, defendants Joseph Shayota and his wife Adriana Shayota ran Baja Exporting, LLC ("Baja Exporting")—a California company that imported, exported, and distributed snacks and drinks to gas stations, convenience stores, and bodegas, both in the United States and abroad. In 2009, Baja Exporting contracted with Living Essentials, LLC and its related entities (collectively "Living Essentials") to sell the liquid dietary supplement 5-Hour Energy in Mexico.

Unfortunately, the product did not sell well. The parties terminated their sales agreement in 2010, and Baja Exporting was left with excess bottles of Spanish-labeled 5-Hour Energy. Rather than dispose of the bottles, Baja Exporting tried to sell them in the United States, despite not having approval from Living Essentials to do so. When the product again failed to sell, the Shayotas and their associates relabeled the bottles in English and sold them without authorization from Living Essentials.

By December 2011, Baja Exporting had sold the last of its 5-Hour Energy supply. Given the potential market in the United States, the Shayotas and their associates then conspired to create a counterfeit version of the drink, pass it off as genuine 5-Hour Energy, and distribute it across the country.

A

The scheme lasted from early 2012 to November 2012 and involved several key players. Joseph Shayota oversaw and financed the operation. Adriana Shayota was in charge of the accounting; she collected invoices for the counterfeit product and made wire transfers to cover costs. Walid Jamil (Joseph's brother-in-law) and Justin Shayota (Joseph and Adriana's nephew) coordinated the repackaging and relabeling of the counterfeit drink at Baja Exporting's San Diego warehouse. They worked closely with Leslie Roman, who supplied blank bottles and manufactured counterfeit 5-Hour Energy labels. Jamil hired others to create the counterfeit drink and to manufacture boxes for the finished product. Finally, Justin sent the finished product either to Baja Exporting or to Dan Dee Company—a cash-and-carry warehouse owned by Kevin Attiq—for distribution across the country.

Living Essentials became aware of the scheme in 2012, after it noticed a mysterious drop-off in its California sales. Living Essentials hired private investigators, who ultimately raided warehouses controlled by Baja Exporting and Jamil and discovered boxes of counterfeit 5-Hour Energy. Consequently, Living Essentials sued the Shayotas, Jamil, and others, alleging numerous violations of laws pertaining to trademark infringement and false advertising.

During discovery, Living Essentials deposed numerous participants in the scheme, including Jamil and Roman. Because the Shayotas were parties to the suit, their counsel attended the depositions and questioned the witnesses. The civil suit ultimately ended in a settlement in which Baja Exporting agreed to pay $6 million to Living Essentials.

B

Subsequent to the civil proceedings, the government launched a criminal investigation into the scheme. A grand jury returned an indictment against the Shayotas, Jamil, and Roman, among others. The government ultimately filed a two-count Superseding Information charging each defendant with (1) conspiracy to traffic in counterfeit goods, in violation of 18 U.S.C. § 2320(a), and (2) conspiracy to commit copyright infringement and to introduce misbranded food into interstate commerce, in violation of 17 U.S.C. § 506, 18 U.S.C. § 2319, and 21 U.S.C. §§ 331 and 333. Jamil and Roman pleaded guilty; the Shayotas proceeded to trial.

As trial approached, the government notified defense counsel of its intent to offer into evidence statements made by Jamil and Roman during their civil depositions. The Shayotas moved to exclude the testimony on the ground that its admission would violate the Sixth Amendment's Confrontation Clause if Jamil and Roman refused to testify, but the district court denied the motion. The depositions were introduced at trial after Jamil and Roman invoked their Fifth Amendment privilege not to testify, and the jury ultimately found the Shayotas guilty of the charged offenses.

The Shayotas timely appealed their convictions.

II

The Shayotas argue that admission of Jamil's and Roman's deposition testimony violated the Sixth Amendment's Confrontation Clause.[1]

The Sixth Amendment to the United States Constitution provides in pertinent part: "[I]n all criminal prosecutions the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Generally, this means that the government must produce at trial any witnesses who have offered testimonial evidence against the accused. But where, as here, the prosecution chooses not to produce such witnesses and offers their hearsay statements instead, a defendant's right of confrontation is satisfied if (1) the declarant is unavailable, and (2) the defendant had a prior opportunity to confront him through cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The district court concluded that Jamil and Roman were unavailable because they had validly invoked their Fifth Amendment privilege against self-incrimination. The court also ruled that the Shayotas had a prior opportunity to cross-examine Jamil and Roman in the civil suit, given that the Shayotas sent their lawyers to attend Jamil's and Roman's depositions in that case.

The Shayotas dispute the district court's legal conclusion that Jamil and Roman were unavailable. They argue that Jamil and Roman were in fact available because the

---

[1] We address the Shayotas' other arguments on appeal in a memorandum disposition issued concurrently with this opinion. *See United States v. Shayota*, Nos. 17-10270 & 17-10271, — F. App'x — (9th Cir. 2019).

government could have granted them immunity and compelled them to testify.

We have held on numerous occasions that a witness's assertion of Fifth Amendment privilege renders him "unavailable" for purposes of the Confrontation Clause. *See, e.g.*, *United States v. Wilmore*, 381 F.3d 868, 872 (9th Cir. 2004); *see also California v. Green*, 399 U.S. 149, 167–68 (1970) (explaining in dicta that once a witness has been produced at trial and "claimed his privilege against compulsory self-incrimination, . . . nothing in the Confrontation Clause prohibit[s] the State from . . . relying on his prior testimony to prove its case"). But we have yet to confront the Shayotas' precise argument here—that the government's inherent discretion to grant a witness immunity and thereby prevent him from invoking the privilege against self-incrimination renders the witness effectively available to the government for testimony at trial. Nevertheless, we need not resolve the issue here: even if the district court erred by concluding that Jamil and Roman were unavailable, the error was harmless.

"[C]onfrontation [C]lause violations are subject to harmless error analysis." *United States v. Bernard S.*, 795 F.2d 749, 756 (9th Cir. 1986). "Whether a violation of the [C]onfrontation [C]lause is harmless depends on a variety of factors including: (1) the importance of the evidence to the prosecution's case; (2) whether the evidence was cumulative; (3) the presence of corroborating evidence; (4) the overall strength of the prosecution's case." *Id.* To be sure, the testimony of Jamil and Roman was an important component of the trial. But the testimony was also corroborated by live witness testimony, including that of Kevin Attiq and Justin Shayota who described the Shayotas' involvement in the

scheme, and a bounty of other circumstantial evidence relating to the Shayotas' management of the counterfeit product and exchange of invoices with other members of the conspiracy. Considering the other evidence presented at trial, the prosecution's case against the Shayotas was strong. We conclude that the outcome of the trial would not have changed had the depositions been excluded.[2]

### III

The judgment of the district court is **AFFIRMED.**

---

O'SCANNLAIN, Circuit Judge, specially concurring:

I write separately to call attention to our court's precedent regarding the "unavailability" requirement of the Sixth Amendment's Confrontation Clause. We have held that a witness is unavailable for purposes of the Confrontation Clause if he invokes his Fifth Amendment privilege and refuses to testify. *See, e.g.*, *United States v. Wilmore*, 381 F.3d 868, 872 (9th Cir. 2004). Presumably we have done so because such a witness is considered unavailable under the former testimony exception to the federal hearsay rule. *See id.* (citing Fed. R. Evid. 804(b)(1)). But the right of confrontation is "most naturally read as a reference to the right of confrontation at common law, admitting only those

---

[2] We also reject on harmless error grounds the Shayotas' argument that former testimony cannot be admitted unless the parties and issues in the prior civil proceeding were identical to those at the subsequent criminal trial and the defendants were physically present during the prior testimony.

exceptions established at the time of the founding." *Crawford v. Washington*, 541 U.S. 36, 54 (2004). Thus, a determination of whether the former testimony of a witness who has since invoked his Fifth Amendment privilege is admissible necessarily requires an analysis of whether such testimony would have been admitted at the time of the founding. Our court has yet to do that work, but history suggests that the scope of unavailability may be narrower than our court has recognized. I respectfully suggest that we should revisit our prior decisions to perform the historical analysis that *Crawford* demands.

I

To understand how the Confrontation Clause applies, we must first understand its history. I will not duplicate the efforts of courts and commentators who have thoroughly recounted the development of the right of confrontation from sixteenth-century England to the founding. *See, e.g.*, *Crawford*, 541 U.S. at 42–49; Daniel H. Pollitt, *The Right of Confrontation: Its History and Modern Dress*, 8 J. Pub. L. 386 (1959). It is enough to say that the common law right emerged in England in the mid-1600s as a reaction to the widespread use of ex parte affidavits and depositions instead of face-to-face examination in criminal trials against the accused. *See Crawford*, 541 U.S. at 44–45. To prevent such abuses from taking root in the United States, the First Congress in 1789 included "the Confrontation Clause in the proposal that became the Sixth Amendment." *Id.* at 49; *see also Mattox v. United States*, 156 U.S. 237, 242 (1895) (recognizing that the primary object of the Clause was to "prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, [from] being used against the prisoner in lieu of a personal examination and cross-

examination of the witness"). Thus, "[t]he right of confrontation did not originate with the provision in the Sixth Amendment, but was a common-law right having recognized exceptions." *Salinger v. United States*, 272 U.S. 542, 548 (1926); *accord* 3 Joseph Story, *Commentaries on the Constitution of the United States* 662 (1st ed. 1833).

In England, such exceptions relied on a "relatively strict rule[] of unavailability." *Crawford*, 541 U.S. at 44; *see also* Tim Donaldson, *Gradually Exploded: Confrontation vs. The Former Testimony Rule*, 46 St. Mary's L.J. 137, 156 (2015) (collecting cases). *Lord Morley's Case*, 6 How. St. Tr. 769 (H.L. 1666), for example, explained that a coroner's out-of-court examinations of witnesses were admissible if "the witnesses . . . were dead or unable to travel," or if they were "absent . . . by the means or procurement of the prisoner." *Id.* at 770–71. Such a rule persisted in England well into the 1700s. *See* 2 William Hawkins, *A Treatise of the Pleas of the Crown* 429 (1721) (explaining that depositions "may be given in evidence . . . if it be made out by Oath to the Satisfaction of the Court, that such Informer is dead, or unable to travel, or kept away by the Means or Procurement of the Prisoner"). Other sources of English law suggest that depositions could also be admitted if the witness was beyond the jurisdictional reach of the court. *See* Henry Bathurst, *The Theory of Evidence* 34 (1761) ("[I]f the Witnesses examined on a Coroner's Inquest are . . . beyond Sea, their Depositions may be read.").

The American tradition similarly permitted the use of deposition testimony, at least when the witness was dead and perhaps also when he was missing or outside of the court's jurisdiction. *See Cline v. State*, 36 Tex. Crim. 320, 360–61 (Tex. Crim. App. 1896) (Henderson, J., dissenting)

(collecting cases); *see also Johnston v. State*, 10 Tenn. 58, 59–60 (Err. & App. 1821) (holding that "depositions . . . may be read on trial against a prisoner" when the witness is proven dead); *State v. Atkins*, 1 Tenn. 229, 229 (Super. L. & Eq. 1807) (per curiam) (same). *But see United States v. Angell*, 11 F. 34, 43 (C.C.D. N.H. 1881) ("I have found no case where the testimony of a witness, absent but living, given at a former trial, has been allowed to be proved at a subsequent trial."); *People v. Newman*, 5 Hill 295, 296 (N.Y. Sup. Ct. 1843) ("[N]othing short of the witness'[s] death can be received to let in his testimony given on a former trial.").

Notably absent from founding-era case law,[1] however, are decisions permitting the adverse use of former testimony of witnesses who claimed a testimonial privilege—even though such privileges existed at common law, *see, e.g.*, *Quinn v. United States*, 349 U.S. 155, 161 (1955) (explaining that the privilege against self-incrimination was "firmly established . . . in the common law of England" by the mid-1600s and "[t]ransplanted to this country as part of our legal heritage"). The absence of such cases suggests that there may not have been a common-law exception to the right of confrontation for former testimony of witnesses who claimed a privilege against self-incrimination.

II

---

[1] There are cases from the early 1900s which admit former testimony by a witness who claims a privilege. But in addition to being farther in time from the founding, these cases do not discuss the right of confrontation at all. *See, e.g.*, *State v. Stewart*, 85 Kan. 404 (1911). Such cases therefore have little—if any—bearing on the question of unavailability under the Confrontation Clause at the time of the founding.

The Supreme Court has yet to consider the historical limitations of the unavailability requirement. Rather, in decisions that predate *Crawford*, the Court has provided conflicting guidance on the scope of the unavailability requirement. On the one hand, in *Douglas v. Alabama*, 380 U.S. 415 (1965), the Court held that the defendant's right of confrontation was violated by the admission of a confession that implicated the defendant and that was given by a witness who invoked the Fifth Amendment. *Id.* at 420.

By contrast, in *California v. Green*, the Court observed that the Confrontation Clause would *not* be violated if a witness "claimed his privilege against compulsory self-incrimination." 399 U.S. 149, 167 (1970); *accord Lee v. Illinois*, 476 U.S. 530, 549–50 (1986) (Blackmun, J., dissenting) (concluding that a witness was unavailable because he would have invoked his Fifth Amendment privilege). And, most recently, in *Lilly v. Virginia*, 527 U.S. 116 (1999), a plurality of the Court "assumed" without deciding that a witness is "unavailable . . . for Confrontation Clause purposes" when he invokes his Fifth Amendment right against self-incrimination. *Id.* at 124 n.1. The need for such an assumption suggests that the question of unavailability is far from settled and requires further examination by lower courts.

III

Rather than consider the common law, our court has relied on the former testimony exception to the hearsay rule—Federal Rule of Evidence 804—to define the contours of unavailability under the Confrontation Clause. *See Wilmore*, 381 F.3d at 872 (citing Fed. R. Evid. 804(a) and

relying only on circuit precedent that predates *Crawford*).**²** In my view, such reasoning is problematic.

*Crawford* all but rejected the view that the Confrontation Clause is satisfied so long as the evidence fits neatly within a federal hearsay exception. As the Court explained, the Confrontation Clause's application does not "depend[] upon the law of Evidence." 541 U.S. at 50; *see also id.* at 51 (acknowledging that "*ex parte* examinations might sometimes be admissible under modern *hearsay* rules, but the Framers certainly would not have condoned them" (emphasis added)). A contrary conclusion would improperly conflate the requirements of the Confrontation Clause and the hearsay rule when the two often serve distinct functions in the presentation of evidence and the preservation of rights. *See id.* at 51 ("Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices."). We must, therefore, do more than look only to the requirements of Rule 804 when deciding whether the admission of certain testimony violates a defendant's right of confrontation.

Relying on dicta in *United States v. Yida*, 498 F.3d 945, 950 (9th Cir. 2007), however, the government argues that "Rule 804(b)(1) implements the command of the . . .

Confrontation Clause," and that satisfying Rule 804 therefore satisfies the right of confrontation. But *Yida* acknowledges nothing more than the obvious: Rule 804 incorporates the

---

**²** Federal Rule of Evidence 804 permits the introduction of former testimony if the witness is "unavailable" and defines unavailability to include a valid assertion of privilege. *See* Fed. R. Evid. 804(a)(1), (b)(1).

Constitution's *general* requirements of unavailability and a prior opportunity for cross-examination. *Yida* expressed no view on whether Rule 804(a)'s enumerated classes of unavailable witnesses echo those existing at common law.

Indeed, there are sound reasons to conclude that unavailability for purposes of the Confrontation Clause ought not to include the assertion of a testimonial privilege. Considering the common law sources described above in part I, the scope of unavailability at common law appeared to be defined by circumstances outside the prosecution's control—the death of the witness, for example, or the prosecution's inability to procure his attendance due to jurisdictional limitations. Yet the government is not so powerless to prevent a claim of privilege, as it can grant the witness immunity or enter into a plea agreement with the witness to provide for his testimony. In either case, the witness would be unable to invoke the Fifth Amendment and could then be made to testify. *See Kastigar v. United States*, 406 U.S. 441, 458 (1972) ("[U]se and derivative-use immunity is constitutionally sufficient to compel testimony over a claim of the privilege."); 5 Wayne R. LaFave, *Criminal Procedure* § 21.2(e), at 60 (2d ed. Supp. 2007) ("[I]t is generally accepted that 'when a defendant breaches his plea agreement, the Government has the option to either seek specific performance of the agreement or treat it as unenforceable' (at least absent language in the plea agreement specifying fewer or other remedies).")

To be sure, such choices "entail significant costs." *Lee*, 476 U.S. at 550 (Blackmun, J., dissenting). "A plea agreement necessarily compromises the community's legitimate correctional interests, and a grant of immunity places a heavy evidentiary burden on any future prosecution

of the witness." *Id.* But nothing entitles a prosecutor to introduce any evidence he wishes; the Constitution, by contrast, entitles the defendant to confront the witnesses against him unless a well-recognized exception to the right of confrontation applies. That there may be significant costs should not lead us to ignore Sixth Amendment protections. *Cf. United States v. Stevens*, 559 U.S. 460, 470 (2010) ("The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs.").

IV

The district court's decision to admit the testimony of Jamil and Roman finds support in our case law. But "the Sixth Amendment demands what the common law required." *Crawford*, 541 U.S. at 68. In future cases, I hope that our court, inspired by *Crawford*, might reconsider the scope of the unavailability requirement in light of the common law.