Filed 1/14/20

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E070658 |
| v. | (Super.Ct.No. RIF1506320) |
| HIPOLITO OSORIO MORALES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Thomas Kelly, Judge. (Retired judge of the Santa Cruz Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B. and II.C.

1

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, Craig H. Russell, and Helen H. Hong, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Hipolito Osorio Morales was charged with two counts of oral copulation or sexual penetration of a child under 10 (Pen. Code, § 288.7, subd. (b))[1] and seven counts of committing a lewd or lascivious act on a child under 14 (§ 288, subd. (a)). During his trial, the trial court admitted into evidence, after jury deliberations began and without any limiting instructions, a video and transcript of Morales's police interrogation. In a pre-*Miranda*[2] portion of that interrogation, an officer made statements to the effect that children had informed law enforcement that Morales had molested them; he (the officer) knew Morales was lying; he could tell Morales was lying from his experience as an investigator; and Morales committed the crimes. Although the officer testified at trial, the parties had agreed to limit questioning to the post-*Miranda* portion of the interrogation only. The jury found Morales guilty, and he was sentenced to 175 years to life.

In the published portion of this opinion, we address Morales's contention that admission of the officer's statements from the pre-*Miranda* portion of the interrogation violated the confrontation clause. According to Morales, because the full interrogation was admitted only after the officer was excused and the jury began its deliberations, he

---

[1] All further undesignated statutory references are to the Penal Code.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

was deprived of the right to confront the officer about the pre-*Miranda* statements described above, none of which were repeated after Morales was read his *Miranda* rights. We find no confrontation clause violation. In order to implicate the confrontation clause, a statement must be testimonial, meaning that it must be made with sufficient formality and with the primary purpose of creating a substitute for trial testimony. Accusatory statements made *by* law enforcement in an interrogation will, absent unusual circumstances, satisfy neither of these requirements.

We address Morales's other contentions in the unpublished portion of this opinion. We find them unmeritorious and therefore affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2012, Morales and his wife[3] moved into a house in Perris. A.C., her brother G.C., and their parents also lived in the house.

A.C., who was born in 2007, testified that after Morales moved in, he began to touch her in inappropriate ways, such as by rubbing and touching her rear, kissing her, and pulling down her shorts. Morales would also touch and put his tongue inside A.C.'s mouth and vagina and touch her breasts underneath her clothes. Although A.C. would tell Morales to stop, he would not listen. Neither A.C.'s parents nor Morales's wife would be around when this occurred. According to A.C., Morales would promise to give A.C. money and make her a dollhouse. A.C. did not tell her parents about Morales's

---

[3] Morales stated during his interrogation that he and his wife have never been married, although Morales and other witnesses at trial referred to the woman as his wife.

3

actions because she was afraid they would think she was "nasty" and would not love her anymore.

G.C., A.C.'s younger brother, testified that he would see Morales kiss A.C. and make her touch Morales's "private part." G.C. stated that Morales would also fondle G.C.'s penis and digitally penetrate G.C.'s anus. A.C. had observed Morales touch G.C.'s "private part" as well. A.C. did not want to tell their mother because, as with her, A.C. was afraid that their mother would think G.C. was "nasty" and no longer love him. G.C. stated that he was scared at the time and remains embarrassed about what happened.

S.M., a friend of A.C., lived next door. S.M. testified that on various occasions Morales had touched her anus and vagina, pulled down her skirt, and kissed her rear. On one occasion, S.M. observed Morales attempt to enter a closed room while A.C. was changing inside and that Morales did not stop after A.C. told him to. S.M. was scared to tell her mom about what Morales did because she was afraid that she would get in trouble for not telling her before. S.M. also stated that what Morales did was embarrassing to think about and that when she begins to remember it, she gets sad and tries to stop remembering.

On October 7, 2015, A.C. was at S.M.'s house, and the two went to A.C.'s house to get dolls. At some point after the two arrived at A.C.'s house, Morales touched A.C.'s rear over her shorts for two to three minutes. It is not clear whether Morales touched S.M. as well. According to the girls, Morales gave A.C. a handwritten letter and told her not to show anybody. The letter read: "I promise your little house in three weeks. This

4

is a real promise because I love you so much.  You are my good girl, my better girl, my favorite girl, my beautiful girl.  You are so nice.  You are so nice [A.C.].  Remember your little house will be delivered 10 – 23 – 15."  Later that day, A.C. informed S.M.'s mother that Morales had touched her, at which point S.M.'s mother called the police.

Morales was interrogated by Deputy Sheriff Manuel Campos at the Perris police station that same day.  At the beginning of the videotaped interrogation, which was conducted in Spanish and later transcribed, Campos repeatedly informed Morales that he was not under arrest.  After some initial questions about Morales and his relationship to the girls and their families generally, Campos relayed A.C.'s and S.M.'s claims that Morales had been "touching them on their bodies."[4]  Morales denied the claims, but as the interrogation continued, Campos began to accuse Morales, telling him that he (Campos) knew Morales was lying about whether he molested the girls.  For example, Campos variously stated that:  "[Y]ou lied," "I don't believe you," "I noticed that you went from lying to telling me the truth," "I know when someone is lying to me and I know when someone is telling me the truth," "I know that you pulled down those – those girls' pants," "I already know that you did it," "these girls – all boys and girls speak the truth," and "I'm telling you right now that I know the truth."  At one point, Campos stated that he could tell, based on professional experience, that he knew Morales was lying:  "I've been almost – almost 20 – 20 years doing this job.  [¶]  . . .  [¶]  And I have

---

[4] At the time, neither the parents nor law enforcement appeared to know whether G.C. had been molested.  G.C. did not disclose what Morales had done to him until some weeks later.

spoken to a lot of people, and I can look at you now and I can tell you that I know that you're not telling me the truth." Campos also stated that there was additional evidence that Campos would not reveal to Morales: "When – when all of this goes to court they'll know that you're lying to me. Because I also have proof I'm not showing you. Okay?" In addition, Campos relayed statements from A.C. and S.M. about how Morales had touched them, such as Campos's statement that "one girl . . . says that you pulled down her – you pulled down her pants and that you – that you gave her a kiss down there." In response to Campos's questioning, Morales admitted that he had touched A.C. and S.M., although not sexually, and that he wrote the letter to A.C.

At a point in the interrogation after Campos made all of the above statements, Campos arrested Morales and read him his *Miranda* rights. (See *Miranda v. Arizona*, *supra*, 384 U.S. 436.) The interrogation then continued with Morales denying that he ever touched A.C. or S.M. sexually.

At trial, both Morales and Campos testified, as did the three children and a handful of other witnesses. Before either Morales or Campos took the stand, the People indicated on the record that they intended "to only cover the portions of [Morales's interrogation] that was discussed with [Morales] post-*Miranda*." Campos testified before Morales, and the questions focused only on the post-*Miranda* portion of the interrogation. When Morales later took the stand, however, he testified that he had lied to Campos during the interrogation about touching the girls and writing the letter, saying he did so because he felt confused, scared, and threatened by Campos. Morales stated that he lied to Campos

6

because he did not know what Campos was accusing him of, because Campos was threatening him by asking "strong" questions and standing "too close," and because he (Morales) was raised in a small town in Mexico "where there's a lot of abuse in authority" and was therefore afraid of what Campos might do.

To the People, Morales had opened the door to the entire interrogation by characterizing it as coercive. However, the People did not seek to offer the full interrogation into evidence immediately following Morales's testimony. Rather, after both sides rested their case and delivered closing arguments, and after the jury was given instructions and retired to deliberate, the People, in a final "housekeeping" discussion with the trial court, requested that the full interrogation be admitted into evidence. Morales objected, contending that admission of the full interrogation constituted "evidence that is presented to the jury after the close of evidence" and that admission would violate his Sixth Amendment right to confront witnesses against him. The trial court disagreed and allowed the full interrogation to go to the jury.

The jury found Morales guilty on all counts. At sentencing, the trial court sentenced Morales to a term of 175 years to life. The trial court also imposed $40,000 in direct victim restitution ($25,000 to A.C., $10,000 to G.C., and $5,000 to S.M.), among other fines and fees. The trial court arrived at $40,000 by awarding $5,000 to each child for each year of abuse they suffered. The trial court noted that the People had requested $50,000 per year per child pursuant to *People v. Smith* (2011) 198 Cal.App.4th 415, which had upheld such a formula. After discussing the issue with the parties, however,

7

the trial court reduced the amount to $5,000 per year per child. The trial court stated:

"These children have suffered greatly. Their innocence has been taken away. They've witnessed things that no child should ever witness. It's going to cause, I'm sure, lasting damage, and they need all the help that they can get for their recovery, so these are very modest figures when you consider the gravity of what's been done to them, so that will be imposed."

## II. ANALYSIS

A. *Confrontation Clause*

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." This confrontation clause is made applicable to the states via the Fourteenth Amendment. (*Pointer v. Texas* (1965) 380 U.S. 400, 403.)

In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court held that the confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id.* at pp. 53-54.)[5]

---

[5] Here, Campos did appear at trial. Nevertheless, Morales contends that the fact that the full interrogation was admitted into evidence as late as it was effectively made Campos "a witness who did not appear at trial" (*Crawford*, *supra*, 541 U.S. at p. 54) with regard to the pre-*Miranda* statements for confrontation clause purposes. We agree. Contrary to what the People argue, the mere fact that Campos testified at trial does not render the confrontation clause inapplicable here. (See *United States v. Wilmore* (9th Cir. 2004) 381 F.3d 868, 872, fn. 6 [finding confrontation clause violation under *Crawford* in case where "it was only after the evidence was admitted that [the witness] became unavailable . . . ."].) Because Campos was not recalled and cross-examined after the

Only statements that are testimonial "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." (*Davis v. Washington* (2006) 547 U.S. 813, 821.) Citing Webster's, *Crawford* defined "testimony" as "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" (*Crawford*, *supra*, at p. 51.) The court, however, declined to "spell out a comprehensive definition" of when a statement is or is not testimonial. (*Id.* at p. 68.)

Since then, our Supreme Court has concluded that "a statement is testimonial when two critical components are present." (*People v. Lopez* (2012) 55 Cal.4th 569, 581 (*Lopez*); see also *People v. Dungo* (2012) 55 Cal.4th 608, 619.)

"First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity." (*Lopez, supra*, 55 Cal.4th at p. 581.) For instance, in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, the United States Supreme Court held that "'certificates of analysis' showing the results of . . . forensic analysis" were testimonial because they were "'declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths'" and were therefore "incontrovertibly a '"solemn declaration or affirmation made for the purpose of establishing or proving some fact."'" (*Id.* at pp. 307-308, 310.) Similarly, in *Bullcoming v. New Mexico* (2011) 564 U.S. 647, the court held that "the formalities attending the

---

*[footnote continued from previous page]*
*[footnote continued from previous page]*
purportedly testimonial statements were offered into evidence, we conclude that, for confrontation clause purposes here, he was not a witness who appeared at trial.

9

'report of blood alcohol analysis'" at issue were "more than adequate to qualify [the assigned forensic analyst's] assertions as testimonial" where the report was "'formalized' in a signed document." (*Id.* at p. 665.) Conversely, in *Lopez*, where no one "signed, certified, or swore to the truth of the contents" of a report, our Supreme Court held that the report was "not prepared with the formality required . . . for testimonial statements." (*Lopez, supra*, 55 Cal.4th at p. 584; see also *People v. Sanchez* (2016) 63 Cal.4th 665, 696-697 [notice that was "part of an official police form containing the officer's sworn attestation that he issued the notice on a given date and that it accurately reflected the attendant circumstances, including defendant's statements," was sufficiently formal].)[6]

Second, a statement is testimonial if it was "given with the 'primary purpose of creating an out-of-court substitute for trial testimony'" or "made with the primary purpose of creating evidence for [the defendant's] prosecution." (*Ohio v. Clark* (2015) 576 U.S. __ [135 S.Ct. 2173, 2181, 2183] (*Clark*); see also *People v. Rangel* (2016) 62 Cal.4th 1192, 1214-1215, 1232.) In conducting a primary purpose analysis, courts consider both whom the statement was made *by* as well as whom it was made *to*. "Statements made *to* someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." (*Clark, supra*, at p. 2182, italics added; see also *ibid.* ["Statements *by* very young children will rarely, if ever, implicate the

---

[6] Although formality is required, the precise "degree of formality . . . remains a subject of dispute in the United States Supreme Court." (*Lopez, supra*, 55 Cal.4th at p. 582.)

10

Confrontation Clause."], italics added; *Giles v. California* (2008) 554 U.S. 353, 376 ["Statements to friends and neighbors about [an abused woman's] abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules . . . ."].) Moreover, in considering primary purpose, courts must "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." (*Michigan v. Bryant* (2011) 562 U.S. 344, 359.) The primary purpose "must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight." (*Id.* at p. 361, fn. 8.)

Of course, a testimonial statement must be offered to the jury for its truth: The confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford*, *supra*, 541 U.S. at p. 59, fn. 9, citing *Tennessee v. Street* (1985) 471 U.S. 409, 414.)

Thus, to summarize, in order for the confrontation clause's bar to apply, a statement must (1) be offered for its truth, (2) have a sufficient degree of formality, and (3) be made with the primary purpose of at least "creating evidence for [the defendant's] prosecution" or "'creating an out-of-court substitute for trial testimony.'" (*Clark*, *supra*, 576 U.S. at p. __ [135 S.Ct. at pp. 2181, 2183].) Here, Campos's pre-*Miranda* statements lacked sufficient formality and were not made for the primary purpose of creating evidence for Morales's prosecution or an out-of-court substitute for trial testimony. As a result, the confrontation clause does not bar their admission.

11

The People contend that Campos's pre-*Miranda* statements were not offered for their truth. Importantly, although the People sought at trial to introduce the full interrogation to rebut Morales's coercion claim, the jury was never told that it may not consider the statements for their truth. In situations such as this—where evidence challenged on confrontation grounds has been admitted for a not-for-the-truth purpose but the jury is never instructed as such—the controlling case law appears to be in tension. In *People v. Hopson* (2017) 3 Cal.5th 424, our Supreme Court considered whether an accomplice's "un-cross-examined confession" was offered for its truth. (*Id.* at p. 432.) In holding that it was, and that its use therefore violated the confrontation clause (*id.* at p. 443), the court relied in part on the "fundamental" fact that "the jury was never informed of the limited nonhearsay purpose for which [the accomplice's] confession was ostensibly admitted" (*id.* at p. 433; see also *id.* at p. 430 ["defense counsel did not request a limiting instruction, and none was given"]). More recently, however, our Supreme Court found the lack of a limiting instruction insignificant in *People v. Bell* (2019) 7 Cal.5th 70. In *Bell*, the court held that the statement in question raised no confrontation clause concerns because it was not offered for its truth. (*Id.* at p. 100.) The statement was admissible in part to rebut the defendant's claim, first raised during his case-in-chief, that law enforcement's forensic "investigation was sloppy." (*Ibid.*) "Accordingly, there was no confrontation clause violation" even though no limiting instruction was given. (*Ibid.*) The court noted that "[a]lthough a limiting instruction was not given, defendant is

in no position to complain.  He failed to make a hearsay objection and, despite the court's invitation, failed to propose a limiting instruction."  (*Ibid.*)

However, we need not attempt to distinguish either case or make a choice between the two (see *Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 456) because whether or not Campos's pre-*Miranda* statements were offered for their truth, they fell short of the formality required to deem them testimonial.  *Lopez* noted that the "degree of formality required . . . remains a subject of dispute in the United States Supreme Court" (*Lopez*, *supra*, 55 Cal.4th at p. 582), but an interrogating officer's statements would fall short of any articulated standard under any normal circumstances. Unlike in *Melendez-Diaz*, Campos's statements were not "'sworn to by the declarant before an officer authorized to administer oaths.'"  (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at p. 310; see also *id.* at p. 308.)  And unlike in either *Melendez-Diaz* or *Bullcoming*, Campos's statements were not written down or formalized in any document signed by him.  (*Melendez-Diaz v. Massachusetts*, *supra*, at pp. 308, 310; *Bullcoming v. New Mexico*, *supra*, 564 U.S. at pp. 653, 665; see also *People v. Sanchez*, *supra*, 63 Cal.4th at pp. 696-697 [notice that was part of form containing "officer's sworn attestation" that defendant's recorded statements were accurate was sufficiently formal].) Rather, like *Lopez*, where no one "signed, certified, or swore to the truth of the contents" of a report, Campos's statements lacked the formality required to invoke Morales's confrontation right.

13

Nor are Campos's pre-*Miranda* statements, or generally any statements made by law enforcement in questioning a witness, made with the necessary primary purpose. Statements *by* law enforcement during an interrogation are rarely, if ever, meant to function as a substitute for trial testimony, because an officer would not expect that such statements be used as evidence at trial. Whatever Campos's subjective intentions could have been, the objective circumstances surrounding Morales's interrogation show that only *Morales's* statements were intended to create evidence for his prosecution. (See *Michigan v. Bryant*, *supra*, 562 U.S. at pp. 360-361, fn. 8.) Moreover, the fact that the statement was made *to* Morales, who is not a law enforcement officer, is meaningful, as "such statements are much less likely to be testimonial than statements *to* law enforcement officers." (*Clark*, *supra*, 576 U.S. at p. __ [135 S.Ct. at p. 2181], italics added.)

In one sense, statements made by an interrogating officer are often made for the purpose of "creating evidence for [the defendant's] prosecution." (*Clark*, *supra*, 576 U.S. at p. __ [135 S.Ct. at p. 2181].) A question or statement in an interrogation, for instance, is generally intended to elicit a response, and such response can constitute evidence. Applying the primary purpose test in this fashion, however, would sweep too broadly, as it would make everything uttered by law enforcement in questioning a witness susceptible to confrontation clause challenges. The cases, if anything, point the opposite way. (See, e.g., *Davis v. Washington*, *supra*, 547 U.S. at p. 822, fn. 1 ["And of course

even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate."].)

In short, none of Campos's statements made during the pre-*Miranda* portion of Morales's interrogation were testimonial, no matter how accusatory they appeared.[7]

B. *Due Process*

Morales contends that the introduction of the full interrogation after closing arguments deprived him of due process, as section 1093, subdivision (e) provides that closing arguments may commence "[w]hen the evidence is concluded."

For present purposes, we presume that the introduction of evidence after closing arguments can so distort "the basic right of the accused to make his defense" (*Herring v. New York* (1975) 422 U.S. 853, 859) that it violates due process, even when, as here, the party objecting to the late evidence does not request to reopen the case to amend its closing argument. (See *id.* at p. 862 ["[F]or the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt."].)

Even so, the record shows that Morales did in fact address the full interrogation during his closing arguments. He was thus "in a position to present [his] respective version[] of the case as a whole" to the jury. (*Herring v. New York*, *supra*, 422 U.S. at p. 862.) During his closing argument, Morales contended that the full interrogation was

---

**7** Campos's statements relaying what A.C. and G.C. told law enforcement raise no confrontation clause violation for the additional reason that Morales had an opportunity to, and did, cross-examine the children about molestation at trial.

coercive. As counsel stated: "He's literally in a corner. His entire world, the access to it, is cut off. The only way out is through that deputy. The only way you get through that deputy is compliance. [¶] . . . [¶] He told you what his fears were. He told you that his fears were based on law enforcement in his homeland. How can he compare or how could he not compare law enforcement with this homeland and law enforcement here? He had no experience with law enforcement here. All he knows is what he observed in Mexico." Although a defendant would generally be surprised if the prosecution introduces new evidence after closing arguments have been given, the surprise is less dramatic, and less problematic, when the defendant's closing argument itself refers to that evidence.

Other portions of the record indicate an awareness that the full interrogation would be offered, or at least that the People intended to do so. During rebuttal, the People informed the jury that it would receive "a copy of defendant's interview[,] [t]he full thing, and a transcript to go with that." Moreover, during the "housekeeping" discussion where the People offered the full interrogation into evidence, Morales appeared to acknowledge that his closing argument addressed coerciveness *because* he expected that the full interrogation would be admitted. The trial transcript has the following exchange:

"THE COURT: Well, you opened the door. You made a big point in your final argument about the interview techniques, and how the distance and all the ways they put pressure on someone to elicit a statement, and how your client came from another culture. And so the whole process was called into question in your case. So the exhibit speaks for

16

itself.  The whole interview with your client was videotaped.  The jury can watch it and draw their own conclusions.  So it's just fair play.

"[DEFENSE COUNSEL]:  I understand that.

"THE COURT:  It was kept out of the People's case in chief.

"[DEFENSE COUNSEL]:  I understand that, your Honor.  Our objection was made after the Court determined that the substantive video and transcript will be admitted.[8]  *So that's when our closing argument began to encompass that.*  Nonetheless . . . ."  (Italics added.)

Thus, by the time Morales made his closing argument, he knew, or at least based on the content of his closing argument should have known, that the full interrogation would likely be part of the evidence, even if it had not formally been admitted at that point.  Under these circumstances, the trial court's formal admission of the full interrogation was not an abuse of discretion.  (See § 1094 [order of trial "prescribed in Section 1093 may be departed from" "for good reasons, and in the sound discretion of the court . . . ."].)  He therefore fails to establish a due process violation here.[9]

---

**8** It is not clear whether this refers to some earlier determination that the full interrogation would be admitted or, for example, a tentative indication.  The on-the-record admission of the full interrogation did not occur until the end of this exchange.  It is also not clear when the trial court made the determination referenced here, except that it was logically sometime before Morales's closing argument.

**9** Accordingly, Morales's reliance on *United States v. Noushfar* (9th Cir. 1996) 78 F.3d 1442 is misplaced.  There, the federal Ninth Circuit held that allowing the jury to play 14 tapes, never played in open court, during deliberations was a structural error requiring automatic reversal.  (*Id.* at pp. 1444-1445.)  *Noushfar* would only apply, however, if we found a due process violation in the first instance.  In any event, since

C. *Direct Victim Restitution*

Generally, crime victims are not entitled to restitution for noneconomic losses. (§ 1202.4, subd. (f)(3); *Vigilant Ins. Co. v. Chiu* (2009) 175 Cal.App.4th 438, 445.) However, section 1202.4, subdivision (f)(3)(F) provides an exception for "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288, 288.5, or 288.7," which includes the sections Morales was convicted under. Morales argues that the $40,000 ordered as direct victim restitution ($25,000 to A.C., $10,000 to G.C., and $5,000 to S.M.) lacked adequate factual basis and was therefore an abuse of discretion. "We review the amount ordered for restitution using the abuse of discretion standard" (*People v. Smith*, *supra*, 198 Cal.App.4th at p. 435) and find no error.

In *Smith*, the trial court awarded a molestation victim $750,000 in noneconomic restitution, which it reached by multiplying $50,000 by 15, the years of abuse the victim suffered. (*People v. Smith*, *supra*, 198 Cal.App.4th at p. 437.) On review, the Court of Appeal held that the award was not an abuse of discretion. (*Ibid.*) Here, the People sought to follow *Smith*, requesting $50,000 per child per year of abuse suffered. At the sentencing hearing, after hearing from the parties on the issue, the trial court reduced the

---

*[footnote continued from previous page]*
*[footnote continued from previous page]*
*Noushfar*, the Ninth Circuit has held that the jury's consideration of a single tape not in evidence should be reviewed for harmless error, largely limiting *Noushfar*'s holding to its facts. (*Eslaminia v. White* (9th Cir. 1998) 136 F.3d 1234, 1236-1237 & fn. 1; see also *People v. Gamache* (2010) 48 Cal.4th 347, 397 [discussing *Noushfar* and *Eslaminia* and rejecting structural error analysis].)

amount to $5,000 per child per year, stating that what they have witnessed was "going to cause, I'm sure, lasting damage," and that "these are very modest figures when you consider the gravity of what's been done to them."

In contending that the reduced amount was an abuse of discretion, Morales relies on *People v. Valenti* (2016) 243 Cal.App.4th 1140, where the Court of Appeal rejected restitution awards, also calculated at $50,000 per child per year, to three children. *Valenti*, however, is distinguishable. There, the parents of each of the victims disputed the fact that their sons had been abused in the first instance. (See *id.* at p. 1182 ["Jeremy's mother . . . 'thanked God her son . . . did not sustain actual child abuse.'"]; *id.* at pp. 1182-1183 [Bradley's mother "believes the defendant never committed sexual abuse on him . . . ."]; *id.* at p. 1183 [noting that "all three families were relieved that their sons had not 'actually' been abused."].) Moreover, the parents in *Valenti* were less than clear about what harm their sons suffered from the defendant, if any. (See *id.* at p. 1182 [Jeremy's mother "believed that ultimately learning defendant had a sexual interest in him was confusing to Jeremy, and made him feel betrayed and embarrassed. . . . At sentencing, Jeremy's mother suggested Jeremy 'will suffer ramifications' from his parents' poor judgment, but did not expand on that belief."]; *id.* at p. 1183 [Bradley's father "did not know how defendant's actions would impact Bradley . . . ."]; *ibid.* ["Justin's mother said her son was 'excellent,' and defendant had not succeeded in destroying him or their family."].) (The opinion does not recite any of the children's direct testimony on these issues.) *Valenti* therefore concluded that, based on the record

19

before it, the trial court's "only apparent basis" for its award was the formula upheld in *Smith* and held that the award lacked any rational basis. (*People v. Valenti*, *supra*, at pp. 1183-1184.) Here, in contrast, neither the children nor their parents dispute that Morales abused and molested A.C., G.C., and S.M., and the children's own testimony at trial reveals the psychological harm they suffered from Morales. Moreover, the trial court considered such evidence, and in doing so modified and reduced the restitution award that *Smith* would have produced. Accordingly, *Valenti* does not benefit Morales here.

Morales notes that A.C. and G.C.'s mother requested no restitution and that S.M.'s mother could not be reached when the probation officer prepared the sentencing recommendation. Neither circumstance, however, constituted a reason for the trial court to neglect its duty to award what it considered full restitution to each of the children. (§ 1202.4, subd. (f) ["The court *shall* order full restitution."], italics added.) Here, the trial court considered the evidence, heard arguments, and awarded each child $5,000 per year of abuse they suffered from Morales. We discern no abuse of discretion.[10]

## III. DISPOSITION

The judgment of conviction is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

---

[10] We note that the People requested, and the trial court awarded, restitution for A.C. for five years of harm, despite the fact that the molestation lasted no more than four years. But as in *Smith*, "there is no credible argument, especially on the facts of this case, that [A.C.'s] psychological harm ended when" Morales was arrested. (*People v. Smith*, *supra*, 198 Cal.App.4th at p. 437.)

RAPHAEL

J.

We concur:

CODRINGTON
         Acting P. J.

SLOUGH
         J.